PEOPLE OF the STATE OF ILLINOIS et al., Petitioners,

v.

UNITED STATES of America and Interstate Commerce Commission, Respondents.

No. 77–1333.

United States Court of Appeals, Seventh Circuit.

Argued April 23, 1979.

Decided Aug. 16, 1979.

Rehearing Denied Sept. 21, 1979.

Gordon P. MacDougall, Washington, D. C., James Weging, Asst. Atty. Gen., Commerce Commission Division, Chicago, Ill., for petitioners.

Kenneth P. Kolson, I. C. C., Washington, D. C., for respondents.

Samuel W. Witwer, Jr., Chicago, Ill., for intervenor.

Before CUMMINGS, Circuit Judge, MOORE, Senior Circuit Judge,* and TONE, Circuit Judge.

CUMMINGS, Circuit Judge.

This petition for review was filed by the State of Illinois, the Illinois Commerce Commission and the United Transportation Union and asks us to set aside and remand the report and order of Division 3 of the Interstate Commerce Commission in *Prairie Trunk Railway—Acquisition and Operation,* 348 I.C.C. 832 (1977). The Brotherhood of Locomotive Engineers intervened on behalf of petitioners and the Baltimore & Ohio Railroad Company (sometimes referred to as B & O), the Prairie Trunk Railway, Trans-Action Associates, Incorporated, the

---

* The Honorable Leonard Page Moore, Senior Circuit Judge of the Second Circuit of the United States Court of Appeals, is sitting by designation.

Shawneetown Regional Port District and the Baltimore & Ohio Concerned Citizens of Southern Illinois [1] intervened in support of respondents Interstate Commerce Commission and the United States. In all, nine briefs have been filed in this Court in support of the positions taken by the parties and intervenors.

In the Interstate Commerce Commission's decision presently under review, the Commission authorized the Prairie Trunk Railway to acquire and operate the 73.27-mile line [2] of the Baltimore & Ohio Railroad Company between Flora and Shawneetown, Illinois. 348 I.C.C. 832. In the same report, as shown infra, the Commission authorized Prairie Trunk to issue not more than 750,-000 shares of no-par value common stock to holding company Trans-Action, authorized Trans-Action to control Prairie Trunk and dismissed the application of the Baltimore & Ohio to abandon the line of railway being acquired by Prairie Trunk.

This proceeding commenced with the Baltimore & Ohio's December 1971 application for a certificate of public convenience and necessity under Section 1(18) of the Interstate Commerce Act [3] permitting the abandonment of operations over its branch line between Flora and Shawneetown. In January 1973 an administrative law judge recommended that the Baltimore & Ohio abandonment application be denied. [4]

In October 1973, Prairie Trunk, a corporation organized to acquire and operate the 73.27-mile Flora-Shawneetown line of railroad, sought Commission authority to do so pursuant to Section 1(18) of the Act. Baltimore & Ohio expressed its support of the Prairie Trunk application and asked the Commission to dismiss its own abandonment application upon approval of the Prairie Trunk acquisition. Prairie Trunk also sought authority under Section 20a of the Act (49 U.S.C. § 20a) to issue $100,000 of no-par common stock and a secured 15-year promissory note (not exceeding $650,000) to Trans-Action Associates, a non-carrier holding company controlling Louisiana Midland Railway Company, a common carrier by railroad. Upon the issuance of the securities, Prairie Trunk would become a wholly-owned subsidiary of Trans-Action. [5]

1. This organization represents approximately 100 shippers served by the Flora-Shawneetown, Illinois, branch railroad line involved herein.

2. The 73.27 miles include 5.36 miles of track between Junction and New Shawneetown, Illinois, jointly owned and operated by the Baltimore & Ohio and Louisville & Nashville Railroads. By the acquisition agreement Prairie Trunk purchased B & O's right to use this trackage.

3. During the relevant period Section 1(18) of the Interstate Commerce Act provided in pertinent part:

"[N]o carrier by railroad subject to this part * * * shall acquire or operate any line of railroad, or extension thereof, or shall engage in transportation under this part over or by means of such additional or extended line of railroad, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity require or will require the * * * operation * * * of such additional * * * line of railroad, and no carrier by railroad subject to this part shall abandon all or any portion of a line of railroad, or the operation thereof, unless and until there shall first have been obtained

from the Commission a certificate that the present or future public convenience and necessity permit of such abandonment * *." (49 U.S.C. § 1(18).)

4. The administrative law judge found:

"Notwithstanding applicant's lack of interest in the branch, the record indicates a very substantial traffic potential. The shippers in the area need applicant's services, and an aggressive and positive approach to meeting these needs would appear to assure the traffic gains necessary for profitable operation of the branch". (J.App. 13).

He therefore concluded that the public convenience and necessity would not permit granting the abandonment application.

5. The Commission's report describes the operations of Trans-Action as follows:

"Trans-Action is a transportation consulting firm specializing in light-density rail line problems. Since its organization in May 1971, it has been engaged in the development of short-line feasibility studies (including engineering reports), the financing of new railroad ventures, and, in the course of assisting interested parties involved in transportation regulatory matters, in the preparation of pleadings, analyses, and testimony. It has

A different administrative law judge approved the Section 1(18) acquisition proposed by Prairie Trunk subject to (1) the Commission's subsequent approval of an appropriate application under Section 5(2) of the Act [6] by Trans-Action to control Prairie Trunk, (2) the *Burlington* conditions for the protection of railway employees,[7] the expense of which was to be borne by the Baltimore & Ohio, and (3) certain other conditions pertaining to the acquisition.

In September 1974, Trans-Action filed an application under Section 5(2) of the Act seeking the Commission's approval for control of Prairie Trunk.

These various matters were consolidated for disposition by the Commission in a single report, and on February 17, 1977, the Commission disposed of them. It found that the present and future public convenience and necessity required the acquisition and operation by Prairie Trunk of the Flora-Shawneetown line of railroad subject to (1) the *Burlington* conditions for the protection of employees, which cost was to be borne by the Baltimore & Ohio; (2) the

placing by Trans-Action of $750,000 in cash or equivalent assets at the disposal of Prairie Trunk; and (3) for a period of five years after the acquisition, no abandonment application could be filed by Prairie Trunk prior to a bona fide offer of resale "to any party to this proceeding at a purchase price no less favorable than the $500,000 to be paid to the Baltimore & Ohio Railroad Company for the acquisition, adjusted to Consumer Price Index changes." [8] 348 I.C.C. at 854.

The Commission next found that Prairie Trunk could issue 750,000 shares of no-par value common stock with a stated value of $1 per share to Trans-Action to finance the acquisition.[9] The Commission also found that acquisition by Trans-Action of control by Prairie Trunk was within the scope of Section 5(2) of the Act and consistent with the public interest. The Section 5(2) application had become necessary because on March 27, 1974, the Commission authorized Louisiana Midland Railway Company, a subsidiary of Trans-Action, to acquire and operate a law density branch line of the

functioned as a consultant and provided complete organization and management services for a variety of short-line railroads. In view of this background, particularly that relating to the organization and operation of short-line railroads, we are satisfied that Trans-Action possesses the experience and knowledge required to provide Prairie Trunk with the kind of responsible leadership and management necessary to undertake and successfully pursue the short-line railroad operation proposed herein." (J.App. 49.)

6. Section 5(2) of the Act provides in pertinent part:

"(a) It shall be lawful, with the approval and authorization of the Commission * *

"(i) for two or more carriers to consolidate or merge their properties or franchises, or any part thereof, into one corporation for the ownership, management, and operation of the properties theretofore in separate ownership; or for any carrier, or two or more carriers jointly, to purchase, lease or contract to operate the properties, or any part thereof, of another; or for and carrier, or two or more carriers jointly, to acquire control of another through ownership of its stock or otherwise; or for a person which is not a carrier to acquire control of two or more carriers through ownership of their stock or other-

wise; or for a person which is not a carrier and which has control of one or more carriers to acquire control of another carrier through ownership of its stock or otherwise; or

"(ii) for a carrier by railroad to acquire trackage rights over, or joint ownership in or joint use of, any railroad line or lines owned or operated by any other such carrier, and terminals incidental thereto." (49 U.S.C. § 5(2).)

7. The *Burlington* conditions were developed in *Chicago, B. & Q. R. Co.—Abandonment*, 257 I.C.C. 700 (1944), to protect employees adversely affected by an abandonment or acquisition.

8. This provision was included to overcome the doubts expressed by protestants about Prairie Trunk's good faith intentions to operate the line rather than to take a quick profit from the resale of assets which by then had appreciated well beyond the $500,000 purchase price.

9. The Commission modified the ALJ's order to require the full $750,000 contribution by Trans-Action to be equity, rather than $100,000 equity and $650,000 debt. This was intended to strengthen Prairie Trunk's capital structure and thereby assure its viability.

Illinois Central Railroad Company in the state of Louisiana. Thus with Prairie Trunk's acquisition of the B. & O line, Trans-Action would acquire control of two carriers, bringing Section 5(2) into effect. This relationship was fully disclosed at the proceeding regarding Prairie Trunk's acquisition application, which had been filed under Section 1(18) because at the time (October 1973) Trans-Action was neither a carrier nor affiliated with a carrier. The Commission concluded that Trans-Action's control of both Louisiana Midland and Prairie Trunk was justified, noting:

"[The Louisiana Midland line] is separated geographically from the southeastern Illinois line of railroad and area of service identified with the proposed Prairie Trunk operation by well in excess of 500 miles. * * * [T]he two railroad operations are so clearly separate and unrelated as to merit our concluding that common ownership and control of Louisiana Midland and Prairie Trunk by Trans-Action will have no adverse competitive effect upon the utilizers of their respective services." 348 I.C.C. at 846.

Finally, the Commission found that the Baltimore & Ohio's application for abandonment should be dismissed and that "this decision is not a major Federal action significantly affecting the quality of the human environment within the meaning of the National Environmental Policy Act of 1969." 348 I.C.C. at 855. Consequently, on the same day the Commission issued a certificate of public convenience and necessity and an order carrying out the Commission's report (J.App. 61–62). We affirm.

I. *Section 1(18) of the Interstate Commerce Act Applies to This Acquisition.*

In order to obtain the more liberal employee labor protective conditions established in *Oregon Short Line R. Co.—Abandonment, Goshen,* 354 I.C.C. 76 (1977); 354 I.C.C. 584 (1978) and —— I.C.C. —— (1979),[10] petitioners mainly argue that Prairie Trunk's acquisition should have been con-

sidered by the Commission under Section 5(2) (note 6, *supra*) rather than under Section 1(18) of the Act (note 3, *supra*). We disagree.

As far back as 1928, the Supreme Court recognized that Section 1(18) of the Act is applicable to obtain initial interstate operating authority by a non-carrier like Prairie Trunk. *Texas & C.R.R. v. Northside Ry.,* 276 U.S. 475, 479, 480, 48 S.Ct. 361, 72 L.Ed. 661, and Commission cases cited at 480–481, n.1. Accordingly, the Commission has often held that Section 1(18) governs applications by a non-carrier for authority to acquire and operate an existing line of railroad. *Acquisition by Frankfurt & Cincinnati R.R.,* 124 I.C.C. 500 (1927); *Iowa Term. R. Co.—Acquisition and Operation,* 312 I.C.C. 546 (1961); *Cadillac & Lake City Ry. Co.—Acquisition and Operation,* 320 I.C.C. 617 (1964); *Northwestern Employees —Pur.—Chicago & N.W. Ry. Co.,* 342 I.C.C. 58, 65–66 (1972); *Okmulgee Northern Ry.— Abandonment,* 320 I.C.C. 637 (1964). It is immaterial whether a corresponding abandonment application for the line of track to be acquired has been filed by the existing operating carrier or has been denied. *Acquisition by Frankfurt & Cincinnati R.R., supra; Iowa Term. R. Co.—Acquisition and Operation, supra; Northwestern Employees —Pur.—Chicago & N.W. Ry. Co., supra.* On the other hand, Section 5(2) is applicable to various purchase transactions between two or more carriers.

Petitioners concede that Section 1(18) is concerned with the acquisition of a line being abandoned by another carrier and acknowledge that the Section 1 (18) proceeding would have been proper for Prairie Trunk's acquisition of this branch line if the Commission had approved abandonment of the line by the vendor Baltimore & Ohio (Nov. 1977 Br. 16, 18–19; United Transportation Union and Brotherhood of Locomotive Engineers Group Reply Br. 2). However, the language of Section 1(18) (note 3, *supra*) does not so require, and, as seen, the precedents are to the contrary.

---

**10.** The 1979 opinion in the *Oregon Short Line* case is not yet officially reported but appears in Appendix 1 to the Supplemental Joint Brief of the Interstate Commerce Commission and United States filed on March 26, 1979.

In the present proceeding, the Commission explained the basis for considering this application under Section 1(18) rather than under Section 5(2). It stated that the latter is the appropriate provision for dealing with the unification of existing railroad enterprises, such as a consolidation or merger.[11] 348 I.C.C. at 850–851. On the other hand, the Commission explained that Section 1(18) was intended to deal with the acquisition, abandonment and extension of an individual line of railroad and was essentially directed at the transportation-oriented activities of a single rail carrier or applicant.[12] 348 I.C.C. at 851. Because the present proceeding is concerned with the simple acquisition of a line by a prospective new rail carrier, the Commission followed Section 1(18). *Ibid.* We are satisfied that this rationale [13] was permissible and therefore rule that pre-1976 Section 1(18) governs this 1971 abandonment–1978 acquisition proceeding.[14] Indeed where applicants have mistakenly filed proceedings under Section 5(2), the Commission has treated their applications as if filed under Section 1(18). *Okmulgee Northern Ry. Co.—Abandonment,* 320 I.C.C. 637 (1947); *Iowa Term. R. Co.—Acquisition and Operation,* 312 I.C.C. 546 (1961). Moreover, in other cases the Commission has dismissed a pending abandonment while approving a simultaneous acquisition by a new applicant. *Louisiana Midland Railway Company—Acquisition* (1974) (Finance Docket No. 27450, unreported, reproduced as App. A to Prairie Trunk Br.); *Acquisition of Chicago, Terre Haute & Southeastern Ry. Co.,* 70 I.C.C. 20 (1921); *Cadillac & Lake City Ry. Co.—Ac-*

*quisition and Operation,* 320 I.C.C. 617 (1964). Even though the initial administrative law judge had recommended against abandonment by the Baltimore & Ohio, it was nevertheless appropriate for the Commission itself to authorize Prairie Trunk to operate the Flora-Shawneetown line.[15] *Acquisition by Frankfurt & Cincinnati R.R.,* 124 I.C.C. 500 (1927). In *Okmulgee Northern Ry. Co.—Abandonment, supra,* the only case relied upon to the contrary, abandonment was authorized before the acquisition was. However, the Commission never stated that abandonment was an essential element for the acquisition procedure. Therefore it cannot be said, as petitioners do in their opening brief, that "the usual procedure in a section 1(18) acquisition proceeding is for the I.C.C. to approve an abandonment by the vendor carrier" (Br. 18).

Finally, protestants rely on *North Western Employees Transportation Corporation —Pur.—Chicago & N.W. Ry. Co.,* 342 I.C.C. 58 (1972) and *Newrail Co., Inc.—Pur.— Western Pac. Ry. Co.,* 354 I.C.C. 885 (1979) for the proposition that Prairie Trunk's acquisition from B & O of 5.36 miles of trackage rights jointly owned with Louisville & Nashville Railroad requires this proceeding to be brought under Section 5(2) rather than Section 1(18).[16] Neither of those cases compels that conclusion. Both of them involved the purchase by a newly formed corporation (to be owned by the existing carrier's employees) of all of the railroad-related assets of the vendor, which included many miles of joint ownership of lines, op-

11. Citing *Okmulgee Northern Ry. Co.—Abandonment,* 320 I.C.C. 637, 639–640 (1964); *Tennessee Central Ry. Co.—Abandonment,* 334 I.C.C. 235, 245 (1969); and *Southern Ry. Co.—Control—Central of Georgia Ry. Co.,* 331 I.C.C. 151, 156–157 (1967).

12. Citing *Okmulgee Northern Ry. Co.—Abandonment,* 320 I.C.C. 637, 639–640 (1964); and *Iowa Term R. Co.—Acquisition & Operation,* 312 I.C.C. 546, 548–549 (1961).

13. This rationale was recently adopted and expanded in *Winnebago Farmer's Elevator Company,* —— I.C.C. —— (1978); *Ilinois Central Gulf Railroad Company—Abandonment,* —— I.C.C. —— (1978); and *Terminal Ry. Ala. State Docks*

*Operation, Mobile Ala.,* 354 I.C.C. 747 (1978). All three decisions are attached to petitioners' October 1978 reply brief.

14. The applicability of former Section 1(18) instead of the amended version is discussed in Part IV, *infra.*

15. The differences between the service provided by B & O and that proposed by Prairie Trunk are described in the next section of this opinion.

16. See Section 5(2)(a)(ii), quoted in note 6, *supra.*

erating authorities, and leases of and contracts to operate the properties, including terminals, of other carriers. The *North Western* proceeding was filed under Section 5(2). The hearing examiner rejected the protestants' contention that he lacked jurisdiction because the proceeding should have been brought under Section 1(18). He held that the acquisition of the joint trackage rights by the new corporation (Netco) conferred jurisdiction under Section 5(2). The Commission agreed with the hearing examiner that the involvement of the joint operating and trackage rights gave it jurisdiction under Section 5(2), but noted:

"However, his findings of jurisdiction do not completely meet the requirements of this case since section 5(2) though encompassing the purchase of the properties of two or more carriers, does not deal with the licensing of a noncarrier applicant such as Netco, that has never performed common carrier service.

"[T]his commission has consistently entertained applications by noncarrier corporations, under section 1(18) of the act, proposing to engage in railroad operations. * * * In these circumstances, sections 1(18) and 5(2) are complementary and not mutually exclusive." (342 I.C.C. at 65, citations omitted.)

In the recent *Newrail* case, which involved a proposed transaction very similar to the one in *North Western,* the proceeding was filed under both Sections 1(18) and 5(2), and authority was granted under both Sections. In the case before us, the proceeding was originally filed under Section 1(18), but a supplementary Section 5(2) application was later filed. The Commission chose to treat the transfer of control from B & O to Prairie Trunk, including the transfer of the trackage rights, under Section 1(18). As explained by the ALJ:

"Authorization of assignment of Chessie System's [B & O's] trackage rights as a part of approval of the proposed transac-

tion is consistent with the language of section 1(18), so long as there is no change in the substantive terms of the arrangement" (J.App. 19).

The ALJ and the Commission were justified in proceeding this way.

■ The *North Western* and *Newrail* cases are distinguishable on a number of grounds. First, those cases involved the acquisition of huge interstate rail systems with complex facilities-sharing arrangements with a number of different carriers.[17] Thus the acquisition of trackage and related rights was substantial and a very important part of the transaction. In the present case, the acquisition was of one intrastate short line, which happened to include trackage rights jointly owned with one other carrier over only 5.36 miles of track. As the Commission recognized in the excerpt quoted *supra,* Section 1(18) and 5(2) transactions will often be closely related. Here the Commission was justified in concluding that the *de minimis* involvement of joint trackage rights did not compel proceeding under Section 5(2) in what was otherwise a Section 1(18) case.

Second, the decision to proceed under Section 1(18) was fully consistent with the rationale that Section 1(18) applies to single applicants, whereas the focus in Section 5(2) proceedings is on the potential competitive effect of multi-carrier transactions.[18] The potentially anti-competitive impact of the acquisition of ownership rights in key facilities to which other carriers need access is obvious. In both the *North Western* and the *Newrail* cases the Commission, acting under Section 5(2), imposed appropriate conditions to preserve routes, gateways and other traffic and operating relationships involving other carriers. Of course, there is no occasion for any such concern in the present case, and therefore no need to assume Section 5(2) jurisdiction.

Third, the employee protective provisions usually applied in Section 1(18) proceedings

---

17. The acquisition in the *North Western* case was of 11,373 miles of railroad lines which operated in 11 different states.

18. In *North Western* and *Newrail* the acquisition apparently involved a parent corporation and its subsidiaries, so that technically property of more than one carrier was being acquired.

are appropriate here. The Commission explained that its practice had been to apply the *Burlington* conditions when protection was deemed appropriate in Section 1(18) cases, whereas different and somewhat more expansive protection was normally imposed in Section 5(2) proceedings. The reason for the difference, according to the Commission, is that the *Burlington* conditions were applied when the employees of only a single rail carrier would be affected. 348 I.C.C. at 851. Here only the vendor has protectible employees, and in this respect the proceeding is analogous to an abandonment, which would be dealt with under Section 1(18). In contrast, the *North Western* and *Newrail* cases really amounted to a reorganization of existing lines, with the same employees continuing operations under a new corporate form. From the employees' point of view the situation in those cases was similar to a combination of existing carriers and the conditions usually imposed in Section 5(2) proceedings were therefore appropriate.

Thus the fortuitous involvement of a few miles of shared track does not alter our conclusions that the Commission correctly proceeded under Section 1(18) and that the most appropriate employee protective provisions were applied.

II. *The Commission Properly Concluded that Prairie Trunk's Position Is Required by Public Convenience and Necessity.*

 It is axiomatic that the courts are not to disturb a public convenience and necessity decision of the Interstate Commerce Commission if it is based upon adequate findings supported by substantial evidence. *E. g., United States v. Pierce Auto Freight Lines, Inc.*, 327 U.S. 515, 536, 66 S.Ct. 687, 90 L.Ed. 821. This Record shows that the B & O's service over the Flora-Shawneetown branch was unsatisfactory and had caused numerous complaints from shippers. That carrier was not endeavoring to increase traffic on this branch and did not provide an adequate car supply. Not only had it decreased its service to two times a week on this line, but there was a downward trend of traffic from 1969 through 1979 (except 1970), and the railroad had failed to provide sufficient maintenance expenditures on this branch since 1958. Contrariwise the Commission noted that Prairie Trunk proposed a five-day week service on the line and planned to solicit local traffic aggressively. The Commission was satisfied with Prairie Trunk's management, capital and rolling stock supply. The acquisition was supported by a group of 100 shippers and consignees and the Shawneetown Regional Port District.[19] These findings justified the Commission's conclusion that the acquisition is required by the public convenience and necessity (348 I.C.C. at 854).[20]

III. *An Environmental Threshold Assessment Survey Is Unnecessary.*

 Petitioners urge us to remand this proceeding to the Commission so that it can prepare an environmental threshold assessment survey under the National Environmental Policy Act of 1969. Under that statute, the appropriate agency, here the

---

**19.** The only other shipper group to appear was the I.A.A., a farmers' association, and its position vacillated. It first opposed the B & O abandonment application, then supported Prairie Trunk's acquisition application, and later opposed that acquisition. The final opposition apparently was based on information of disputed veracity.

**20.** Petitioners point out that Section 1(18) was amended prior to the Commission's report, and that it now requires a finding that the present or future public convenience and necessity require *or will be enhanced by* the proposed change (emphasis added). They argue that since the Commission did not specifically make an "enhancement" finding, the case should be remanded to the Commission for a finding that B & O's existing service is inadequate. This is clearly unnecessary because by finding the acquisition required by the public convenience and necessity the Commission said all that was necessary. Additionally, we note that even if the Commission had relied on the "enhancement" rationale, this need not be based on a finding of inadequate present service. Clearly the public interest is enhanced through improved service even if the old service was "adequate." And the Commission plainly found that Prairie Trunk's proposed service would be an improvement over B & O's.

Interstate Commerce Commission, is authorized to determine whether the proposed action is "major Federal actions significantly affecting the quality of the human environment". If so, a detailed environmental statement must be prepared. See 42 U.S.C. § 4332(2)(C). Here the administrative law judge found that since the acquisition proposal contemplated continuing an existing operation with merely a change of management, granting approval of the application would "not have any effect on air pollution, soil pollution, noise pollution, or water pollution; nor are any commitments of natural resources foreseeable" (J.App. 23). The Commission itself reiterated this because the proposed acquisition "contemplate[d] a continuation of rail service over the same trackage" (348 I.C.C. at 853).[21] Since petitioners have not shown that a significant environmental impact could be expected to result from Prairie Trunk's giving the proposed service five times a week instead of twice a week, the Commission's negative environmental determination will not be set aside.[22]

IV. *The Commission Was not Required to Consolidate This Proceeding with Two Other B & O Abandonment Proceedings.*

■ Petitioners also argue that the Commission was compelled to consolidate this proceeding (concerning B & O's abandonment of the 73.27 mile southern segment of the 228-mile line of track between Beardstown and Shawneetown and concerning Prairie Trunk's acquisition) with abandonment applications filed by the B & O relating to the northern and middle segments of this line of track. This Court already rejected that argument (order of March 23, 1977, in case No. 76–1561, cited in 558 F.2d 1032, certiorari denied, 434 U.S. 828, 98 S.Ct. 108, 54 L.Ed.2d 87). We agree with the prior panel that the choice not to consolidate the related proceedings was well within the Commission's discretion. As the ALJ noted in denying consolidation:

"Each of the proceedings is clearly identifiable and separate, the shippers and their interests are different, and the proposed disposition of the applications are different, based upon different facts and circumstances applicable to the respective applications" (J.App. 3).

V. *The Burlington Labor Protective Conditions Were Properly Imposed.*

■ Petitioners' final contention is that the Commission was required to impose the more liberal labor protective conditions set forth in its three *Oregon Short·Line* decisions,[23] instead of the *Burlington* conditions established in *Chicago B. & Q. R. Co.— Abandonment,* 257 I.C.C. 700 (1944). However as we held in Part I of this opinion, former Section 1(18) of the Interstate Commerce Act governs these proceedings, and under that provision, the imposition of employee labor protective conditions is within the discretion of the Commission. *Interstate Commerce Commission v. Railway Labor Assn.,* 315 U.S. 373, 62 S.Ct. 717, 86 L.Ed. 904. Under former Section 1(18) the Commission routinely imposed the *Burlington* conditions where labor protective conditions were warranted. See *Cadillac Lake City Ry.—Acquisition and Operation,* 320 I.C.C. 617 (1964); *Oregon Short Line R.*

---

**21.** Petitioners also assert that because in their view Prairie Trunk is not likely to remain viable for long, the Commission should have required an environmental impact statement for the abandonment it predicts will soon ensue. Clearly the Commission was not required to speculate in this way. Equally clearly, it does not share petitioners' pessimism about Prairie Trunk's prospects. The Commission carefully reviewed Trans-Action's background, ascertained that its support of Prairie Trunk would be adequate, and indicated that it would not look favorably on an abandonment application by Prairie Trunk (348 I.C.C. at 849).

**22.** Indeed the propriety of the negative environmental finding of the Commission is not properly before us since it was not raised in the application for review by the full Commission. *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council,* 435 U.S. 519, 558, 98 S.Ct. 1197, 55 L.Ed.2d 460.

**23.** Two of these decisions are reported in 354 I.C.C. 76 and 584. The third is reproduced in Appendix 1 to the Government's March 1979 Supplemental Brief.

*Co.—Abandonment—Goshen,* 354 I.C.C. 584, 594 (1978). The only employees affected by the acquisition are four B & O employees who work on this section of track two days a week. Under the *Burlington* conditions, these employees will receive four years' pay even though they do not work (B & O Br. 15; Prairie Trunk Br. 16).

Former Section 1(18) of the Interstate Commerce Act was amended on February 5, 1976, when the Railroad Revitalization and Reform Act was enacted. Pursuant to the amendment the Commission was required henceforth to impose in Section 1(18) cases employee labor protective conditions no less favorable than those imposed under former Section 5(2)(f) of the Act. 49 U.S.C. § 1a(4) (90 Stat. 128), now 49 U.S.C. § 10903(a)(2). However, a saving clause in the new statute exempted abandonment or discontinuance proceedings filed or pending before the Commission on February 5, 1976. 49 U.S.C. § 1a(8).[24] Here B & O's abandonment application, prompting the Commission to impose the *Burlington* labor conditions on the B & O, was filed on December 22, 1971, so that there was no necessity for the Commission to impose the *Oregon Short Line* conditions in lieu of the *Burlington* conditions.

In the second *Oregon Short Line* decision the Commission decided to give retroactive application to that case's broad employee labor protective conditions in Section 1(18) applications that had not proceeded to administrative finality on August 18, 1977, the date the Commission's initial *Oregon Short Line* was served. In the present case, the administratively final decision of the Commission was rendered on July 27, 1977, when it denied petitions for reconsideration of its March 15, 1977, decision dismissing B & O's abandonment application and approving the acquisition of the line by Prairie Trunk. 49 U.S.C. § 10327(i) (formerly Section 17(9)(h)). It was appropriate for the Commission to establish a date (August 18, 1977) after which the broader employee labor protective conditions of *Oregon Short Line* would be applied because, as the Commission stated in the second *Oregon Short Line* decision:

"In this manner we will give prospective application to our decision. At the same time, we will not be required to reopen the abandonment cases which were finally decided before service of the prior report. We will also be able to eliminate inconsistent treatment of parties by applying the protection to all cases pending on August 18, 1977." 354 I.C.C. at 595.

This was a reasonable limitation for the Commission to place on its voluntary retroactive extension of *Oregon Short Line.*[25]

Petitioners have made no argument that the *Burlington* conditions are inadequate to protect the interests of the affected employees. Therefore, we will not disturb the cut-off date established by the Commission for the imposition of the *Oregon Short Line* conditions.

The Interstate Commerce Commission's decision is affirmed.

---

24. Section 1a(8) of the Act as amended in 1976 provided:

"Petitions for abandonment or discontinuance which were filed and pending before the Commission as of the date of enactment of this section [February 5, 1976] or prior to the promulgation by the Commission of regulations required under this section [November 1, 1976] shall be governed by the provisions of section 1 of this Act which were in effect on such date of enactment * * *." (90 Stat. 130.)

25. Petitioners also argue that since the proceedings in the present case were stayed by the Commission after August 18, 1977, pending administrative review, there had been no administratively final decision on August 18, 1977. However, by its decision of January 3, 1979, (Respondents' Supp.Br.App. 2) the Commission held that the initial administratively final decision, not extended by stays, is the determinative date for determining whether *Oregon Short Line* applies. This was a reasonable criterion to adopt, especially in view of the fact that the Commission regularly grants stays for administrative or judicial review.