UNITED TRANSPORTATION UNION–
ILLINOIS LEGISLATIVE
BOARD, Petitioner,

v.

INTERSTATE COMMERCE COM-
MISSION and United States of
America, Respondents.

No. 94–1037.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 28, 1995.

Decided April 25, 1995.

Gordon P. MacDougall, Washington, DC, argued the cause and filed the briefs for petitioner.

Louis Mackall, V, Attorney, I.C.C., Washington, DC, argued the cause for respondents. With him on the brief were Henri F. Rush, Gen. Counsel, I.C.C., Anne K. Bingaman, Asst. Atty. Gen., and John J. Powers, III and Robert J. Wiggers, Attys., U.S. Dept. of Justice, Washington, DC. Charles A. Stark, Craig M. Keats and Michael L. Martin, Washington, DC, entered appearances.

Before: EDWARDS, Chief Judge, WALD and RANDOLPH, Circuit Judges.

RANDOLPH, Circuit Judge:

We are unable to decide the principal question posed in this petition for review—whether the Interstate Commerce Commission properly interpreted the Interstate Commerce Act, 49 U.S.C. §§ 10901, 11343, to deprive the agency of jurisdiction over a certain "Joint Line Agreement." The rationale for the Commission's jurisdictional determination is not discernible and, for that reason, the case must be returned to the agency.

## I

### A

Norfolk and Western Railway Company, a wholly owned subsidiary of Norfolk Southern Railway Company, provides rail freight service in thirteen states and Canada. In January 1993, N & W "leased" its rail line in Cook and Will Counties, Illinois, to the Commuter Rail Division of the Regional Transportation Authority of Northeast Illinois d/b/a METRA (METRA) pursuant to a "Joint Line Agreement." METRA is a municipal corporation providing commuter rail passenger service in Chicago, Illinois, and the surrounding metropolitan area. The METRA system consists of 475 miles of track and 230 stations, and serves approximately 76 million passengers annually. METRA provides commuter service itself on certain rail lines and on other lines pursuant to "purchase of service agreements" with freight railroads.

The "Joint Line" subject to the N & W–METRA Agreement runs from 74th Street in Chicago to Manhattan, Illinois. Since 1979, METRA has provided commuter service on the line under a purchase of service agreement with N & W, using N & W trains and employees, but using the "METRA" insignia on the trains, on employee uniforms and on passenger tickets. The Joint Line Agreement altered this arrangement by allowing METRA to use its own trains and employees. Other terms of the Joint Line Agreement are as follows. METRA may use the line for commuter service, but not for freight service. N & W retains a permanent easement over the line, allowing it to furnish common carri-er freight service and to transfer trackage rights to other freight carriers. N & W also retains the right and obligation to dispatch both freight and passenger trains over the line and to issue rules governing operations over it. METRA must maintain the line—its trackage and signals—at a higher speed classification than that at which N & W maintained it. N & W's freight trains may not use the line on weekdays from 6:00 a.m. to 9:00 a.m. and from 4:00 p.m. to 7:00 p.m., unless N & W operations during those times would not interfere with commuter operations and unless METRA grants N & W a waiver from the time restrictions.

### B

N & W petitioned the Commission for a declaratory order that its agreement with METRA was not a transaction subject to the Commission's jurisdiction under 49 U.S.C. § 11343 [1] or 49 U.S.C. § 10901.[2] Section 11343 deals with transactions between existing carriers [3] regulated by the Commission. *See, e.g., Black v. ICC,* 762 F.2d 106, 115 (D.C.Cir.1985). The Commission must approve the merger or consolidation of two or more such carriers and the "acquisition by a rail carrier of trackage rights over, or joint ownership in or joint use of, a railroad line ... owned and operated by another rail carrier," 49 U.S.C. §§ 11343(a), 11344(c). Section 10901 covers other transactions. In general, an entity, including a state agency, acquiring or operating, through purchase · or lease, an active rail line assumes a common carrier obligation to assure that service over

---

1. Section 11343 states in pertinent part:

   (a) The following transactions involving carriers providing transportation subject to the jurisdiction of the Interstate Commerce Commission ... may be carried out only with the approval and authorization of the Commission:

   \* \* \* \* \* \*

   (6) acquisition by a rail carrier of trackage rights over, or joint ownership in or joint use of, a railroad line (and terminals incidental to it) owned or operated by another rail carrier.

2. Section 10901 states in pertinent part:

   (a) A rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission ... may—

   (1) construct an extension to any of its railroad lines;
   (2) construct an additional railroad line;
   (3) acquire or operate an extended or additional railroad line; or
   (4) provide transportation over, or by means of, an extended or additional railroad line;
   only if the Commission finds that the present or future public convenience and necessity require or permit the construction or acquisition (or both) and operation of the railroad line.

3. A "carrier" is defined as a "common carrier" or a "contract carrier." 49 U.S.C. § 10102(2). A "common carrier" is, *inter alia,* a "rail carrier," *id.* § 10102(4). A "rail carrier" is "a person providing railroad transportation for compensation." 49 U.S.C. § 10102(20).

the line continues; therefore it must obtain Commission approval for the transaction.[4] For reasons we discuss later, "[n]oncarriers require Commission approval under section 10901 to construct, acquire or operate a rail line in interstate commerce. Existing carriers require approval under section 10901 only to construct a new rail line or operate a line owned by a noncarrier, since acquisition by a carrier of an active rail line owned by a carrier is covered by 49 U.S.C. 11343." 49 C.F.R. § 1150.1(a); *see generally Simmons v. ICC,* 829 F.2d 150 (D.C.Cir.1987).

The Commission recently carved out an exception to its rule that because noncarriers acquiring the land and tracks underlying an active railroad line assume common carrier obligations to ensure that service over the line continues, they must receive the Commission's approval pursuant to section 10901. In its *State of Maine* decision, the Commission ruled that it did not have jurisdiction over a state agency's acquisition of a carrier's rail line because the carrier retained a permanent, unconditional easement to continue its common carrier freight operations over the line. *Maine, DOT–Acq. Exemption, Me. Cent. R.R.,* 8 I.C.C.2d 835 (1991); *see also Utah Transit Auth.—Acquisition Exemption—Line of Union Pacific R.R.,* Finance Docket No. 32186 (Dec. 31, 1992) (not published); *South Orient R.R.—Acquisition and Operation Exemption—Line of The Atchison, Topeka & Santa Fe Ry.,* Finance Docket No. 31971 (Sept. 2, 1992) (not published). Such transactions do not, according to the Commission, transfer any common carrier obligations subject to its regulatory authority. The freight operator retains the ability to meet its obligations and thus cannot cease

to offer service on the line without the Commission's consent. *See State of Maine,* 8 I.C.C.2d at 837. If the noncarrier is not acquiring common carrier obligations, the Commission believes it has no jurisdiction under section 10901. *Id.*

Whether the transaction went forward, and whether section 11343 or section 10901 gave the Commission jurisdiction over the Joint Line Agreement, were matters the Illinois Legislative Board of the United Transportation Union—the petitioner in this case—thought important. In section 11343 transactions, the Act requires the Commission, as a condition of its approval, to safeguard the interests of adversely affected railroad employees. 49 U.S.C. §§ 11344(a), (b)(1)(D) & 11347; *Norfolk & Western Ry. v. American Train Dispatchers Ass'n,* 499 U.S. 117, 132–33, 111 S.Ct. 1156, 1165–66, 113 L.Ed.2d 95 (1991).[5] On the other hand, in section 10901 transactions the Commission "may" require labor protection. 49 U.S.C. § 10901(c)(1)(A)(ii), (e). The Commission exercises its section 10901 discretion in favor of requiring labor protection only in exceptional circumstances. *Redden v. ICC,* 956 F.2d 302, 304 (D.C.Cir.1992); *Fox Valley & Western, Ltd. v. ICC,* 15 F.3d 641, 644 (7th Cir.1994).

N & W's request for a declaratory order relied on the *State of Maine* exception, arguing that pursuant to the Joint Line Agreement, it would continue freight operations, and METRA would continue commuter service, only now using its own trains and employees. N & W also claimed that METRA's commuter passenger operations, including those over the Joint Line, were wholly within the State of Illinois, and thus not subject to the Commission's jurisdiction. *See* 49 U.S.C.

---

**4.** Two provisions of the Interstate Commerce Act set forth the common carrier obligations. The first states that common carriers "providing transportation or service subject to the jurisdiction of the Interstate Commerce Commission ... shall provide the transportation or service on reasonable request" and that such service shall be "safe and adequate." 49 U.S.C. § 11101(a). The second requires rail carriers to furnish "safe and adequate car service and establish, observe, and enforce reasonable rules and practices on car service." 49 U.S.C. § 11121(a)(1).

**5.** 49 U.S.C. § 11347 states in pertinent part:

When a rail carrier is involved in a transaction for which approval is sought under section[] 11344 [which includes a section 11343 transaction] ... the Interstate Commerce Commission shall require the carrier to provide a fair arrangement at least as protective of the interests of employees who are affected by the transaction as the terms imposed under [*New York Dock*].

In *New York Dock Ry.—Control—Brooklyn E. Dist. Terminal,* 360 I.C.C. 60, 84–90, *aff'd sub nom. New York Dock Ry. v. United States,* 609 F.2d 83 (2d Cir.1979), the Commission set forth a comprehensive set of conditions and procedures designed to meet its § 11347 obligation.

§ 10501(b)(1); *Southern Pac. Transp. Co.— Abandonment Exemption—Los Angeles County, Cal.,* 9 I.C.C.2d 385,.391–92 (1993).[6]

In response to the Commission notice of N & W's request, 58 Fed.Reg. 21,475 (1993), the union filed an opposition, arguing that rather than entertaining the petition for a declaratory order, the Commission should insist that METRA file an application to lease the N & W line and a motion to dismiss for lack of jurisdiction. The union also maintained that METRA is a "carrier" providing interstate commuter passenger service, that N & W would "lose control of key common carrier functions" under the Agreement, and thus, that the Agreement constitutes an acquisition of the "joint use of a railroad line" under section 11343(a)(6), requiring the Commission's approval.

## C

The Commission granted N & W's request for a declaratory order, concluding it had no jurisdiction over the transaction. *Norfolk & Western Ry.—Lease of Line in Cook & Will Counties, Ill.,* Finance Docket No. 32279 (May 21, 1993) (not published). The Commission concluded that the Joint Line Agreement "would not materially impair NW's ability to meet its common carrier obligation," that the Agreement "does not involve the transfer of common carrier rights or obligations subject to [the Commission's] jurisdiction," and thus, that it did not have jurisdiction over the transaction. *Id.* at 3–4. The Commission emphasized that N & W would retain management and control over all freight operations, and dispatching control over both freight and passenger operations; while N & W would not have the right to make repairs under the Agreement, METRA was obligated to maintain the track at a higher speed classification than that required

for freight operations. *Id.* at 3. Although N & W would be precluded from using the line during commuter rush hours, the Commission found that N & W would have access to additional track, enabling it to reach its main Chicago area shipping yard during the restricted periods. *Id.* at 2. Whether METRA was a regulated "carrier," as the union claimed, was—according to the Commission—"not relevant" to whether the transaction transferred a common carrier obligation for purposes of the *State of Maine* exception. *Id.* at 3. Nevertheless, the Commission treated METRA as a provider of wholly intrastate commuter passenger service. *Id.* at 3–4. Because the Commission found "the transaction does not involve an action subject to [its] jurisdiction," it also rejected the union's contention that the Agreement was an acquisition of "joint use" under section 11343(a)(6). *Id.* at 4 n. 5. The Commission later denied the union's petition to reopen on the grounds that the union had not pointed to any material error and had not raised any new relevant evidence. *Norfolk & Western Ry.—Lease of Line in Cook & Will Counties, Ill.,* 9 I.C.C.2d 1155, 1159 (1993).

## II

■ We know the Commission invoked *State of Maine,* but we cannot be certain why it thought, as it apparently did, that the exception applied not only to section 10901, but also to section 11343. *State of Maine,* and other Commission decisions following it, dealt only with section 10901. Which provision—section 10901 or section 11343—potentially covered this transaction turned on METRA's status as an existing "carrier," a matter the Commission deemed irrelevant on the ground that METRA was not acquiring N & W's common carrier obligations.[7]

---

6. 49 U.S.C. § 10501(b)(1) reads in pertinent part:

(b) The Commission does not have jurisdiction . . . over—

(1) the transportation of passengers or property, or the receipt, delivery, storage, or handling of property, entirely in a State (other than the District of Columbia) and not transported between a place in the United States and a place in a foreign country. . . .

7. The parties assume that if METRA is wholly intrastate, it is a "noncarrier," that is, a carrier outside the Commission's regulatory authority. There is at least one circumstance in which the Commission has limited jurisdiction over wholly intrastate transportation, but it is not present here. Under 49 U.S.C. § 11501(b)(4)(B), "intrastate transportation provided by a rail carrier in a State which may not exercise jurisdiction over an intrastate rate, classification, rule, or practice of that carrier due to a denial of certification

We can follow the Commission's reasoning with respect to section 10901, although matters are a bit more complicated than the Commission's opinion indicates. Section 10901 applies only when the acquisition or operation of the additional railroad line is by a "rail carrier providing transportation subject to the jurisdiction" of the Commission. 49 U.S.C. § 10901(a). Hence, "[e]xisting carriers require approval under section 10901 ... to construct a new rail line or operate a line owned by a noncarrier." 49 C.F.R. § 1150.1(a). (Section 11343 covers acquisitions by an existing carrier of a rail line owned by a carrier. *Id.*) Yet many courts have held that section 10901 also applies if, rather than a regulated "rail carrier," a noncarrier such as a state agency seeks "to construct, acquire or operate a rail line in interstate commerce," *id. E.g., Railway Labor Executives' Ass'n v. United States,* 791 F.2d 994, 1003–04 (2d Cir.1986). How can this be? The answer, rarely mentioned in modern cases sustaining the Commission's interpretation of section 10901, is that the noncarrier acquirer is deemed to be a regulated carrier if it would wind up having a common carrier obligation as a result of the transaction. *See Southern Pac. Transp. Co.—Abandonment Exemption—Los Angeles County, Cal.,* 9 I.C.C.2d at 387 n. 4. In other words, "rail carrier" in section 10901(a) includes rail carriers-to-be (whereas "carriers" in section 11343(a) refers to existing carriers). This has been the Commission's position since at least the 1920's. *See Texas & New Orleans R.R. v. The Northside Belt Ry.,* 276 U.S. 475, 479–80, 48 S.Ct. 361, 362–63, 72 L.Ed. 661 (1928); *People of the State of Ill. v. United States,* 604 F.2d 519, 524 (7th Cir.1979); *Iowa Term. R.R.—Acquisition and Operation,* 312 I.C.C. 546, 548–49 (1961); *see also* 2 I.L. SHARFMAN, THE INTERSTATE COMMERCE COMMISSION 262–63 (1931). In this light we can appreciate the logic of *State of Maine* with respect to section 10901 acquisitions by noncarriers: if the noncarrier does not thereby also acquire common carrier ob-

ligations, it is not, nor will it become, a "rail carrier providing transportation subject to the jurisdiction" of the Commission, and hence section 10901(a) does not give the Commission jurisdiction over the transaction.

Section 11343 is a different story. We do not understand—and the Commission did not explain—why a transfer of common carrier obligations, or the lack thereof, should have been significant under section 11343. Assume that prior to entering the agreement with N & W, METRA engaged in interstate transportation (the union claimed that it did) and for that reason was an existing carrier subject to the Commission's regulatory authority. *See* 49 C.F.R. § 1150.1(a). The Joint Line Agreement would then be between two existing carriers—METRA and N & W—and would therefore fall, so the union argues, under section 11343(a)(6), rather than section 10901. Yet by treating METRA's status as irrelevant, the Commission must have believed that it nevertheless would have no jurisdiction over the transaction. It is not clear why. Application of section 11343(a)(6) does not appear to turn on whether common carrier obligations are being transferred from one regulated carrier to another. Section 11343(a)(6) merely says that the Commission must approve one existing carrier's "acquisition" of "trackage rights," or of "joint use" of a railroad line "owned or operated by another rail carrier."

What we have said thus far should be enough to indicate that the Commission has some explaining to do. No court has yet passed on the validity of the *State of Maine* "exception" to section 10901. If we proceeded further we would have to rule on that issue. But we could not stop there. As we have said, it did not matter to the Commission which provision—section 10901 or section 11343—potentially covered the METRA–N & W transaction. We would therefore have to pass as well on the validity of using *State of Maine* in section 11343 trans-

under this subsection shall be deemed to be transportation subject to the jurisdiction of the Commission under subchapter I...." At the time of the METRA–N & W transaction, and until December 19, 1994, the State of Illinois was properly certified and retained jurisdiction over

Illinois intrastate rail carriers. (Under § 11501(b)(4)(B), lack of state certification gives the Commission authority only over intrastate ratemaking and related activities. *Southern Pac. Transp. Co.,* 9 I.C.C.2d at 392.)

actions. But we are completely in the dark about the Commission's reasoning on this subject. Although the Administrative Procedure Act requires all agency "findings and conclusions, and the reasons or basis therefor" to appear in the record, 5 U.S.C. § 557(c)(3), the Commission's opinion contains not a word regarding why it thought, as it apparently did, that *State of Maine's* analysis of section 10901 applies equally to section 11343. Given this state of affairs our only recourse is to send the case back to the Commission. *See, e.g., International Longshoremen's Ass'n v. National Mediation Bd.,* 870 F.2d 733, 736 (D.C.Cir.1989).[8]

The Commission's brief and oral argument offer a rationale for the agency's decision, a rationale that nowhere appears in the administrative record. It is this. Carrying out of the Joint Line Agreement may constitute a "joint use" of a railroad line within the meaning of section 11343(a)(6). But METRA has been jointly using the line for the past twenty-five years. So what we have here is a *continued* joint use, rather than the *acquisition* of a joint use as section 11343(a)(6) contemplates. Commission counsel adds that METRA could not have "acquired" N & W's obligation to provide commuter passenger service because that obligation never rested with N & W. For these and other reasons, the Joint Line Agreement does not result in the transfer, consolidation, or acquisition of any carrier service or use within the Commission's jurisdiction under section 11343(a)(6). *Cf. American Train Dispatchers Ass'n v. ICC,* 671 F.2d 580, 582 (D.C.Cir. 1982). Whether these are good arguments is not for us to say at this point.[9] On remand the Commission may adopt its counsel's position, or it may not.

\* \* \* \* \* \*

The petition for review is granted, the Commission's declaratory order[10] is vacated,

---

**8.** N & W employees were given the option of joining METRA upon consummation of the Joint Line Agreement. Because transactions under § 11343 and those under § 10901 may entitle employees to different levels of labor protection and because employees may be affected by the transaction, the union claims it has standing. Citing section 13(c) of the Urban Mass Transit Act, 49 U.S.C. § 5333(b), and the N & W collective bargaining agreement, the Commission contests this on the ground that N & W employees already are entitled to the same labor protection they would receive if this were a § 11343 transaction within the Commission's jurisdiction. Even if this is so, the transaction may cause employees represented by the union to change employers and that seems to us sufficient to support the union's standing to oppose the Commission's refusal to exercise jurisdiction over the transaction. *Cf. Simmons v. ICC,* 934 F.2d 363, 366 (D.C.Cir.1991).

**9.** At oral argument Commission counsel referred us to a footnote in the Commission's opinion supposedly showing that the Commission had adopted the position he proposed to the court. The footnote reads:
> Because we find that the transaction does not involve an action subject to our jurisdiction, we also conclude that the transaction cannot constitute a joint use arrangement cognizable under [49 U.S.C. § 11343(a)(6)], as argued by [the union].

*Norfolk & Western Ry.—Lease of Line in Cook & Will Counties, Ill.,* Finance Docket No. 32279, at 4 n. 5. We are not sure what rationale the statement is intended to embody. We are sure the footnote is far too murky to satisfy the sort of reasoned agency decision-making needed to sustain the Commission's order.

**10.** The union objects to the Commission's issuing a declaratory order to decide whether it had jurisdiction over the Joint Line Agreement. The APA confers on agencies the discretion to grant declaratory relief, 5 U.S.C. § 554(e), but § 554(a) states that the section applies to adjudications required by statute to be determined "on the record after opportunity for an agency hearing." ATTORNEY GENERAL's MANUAL ON THE APA 59 (1947). The Commission acknowledged that neither § 10901 nor § 11343 requires a determination on the record after opportunity for a hearing. *Norfolk & Western Ry.—Lease of Line in Cook & Will Counties, Ill.,* 9 I.C.C.2d 1155, 1158 (1993). Rather than resting solely on § 554(e), the Commission invoked its "inherent authority" to issue declaratory orders. *Id.* at 1157. The Interstate Commerce Act gives the Commission authority to "carry out" its provisions and, in listing the agency's powers, states that others are not excluded. 49 U.S.C. § 10321(a); *see American Commercial Lines, Inc. v. Louisville & N. R.R.,* 392 U.S. 571, 592, 88 S.Ct. 2105, 2116, 20 L.Ed.2d 1289 (1968). The APA itself provides that none of its provisions "limit ... additional requirements ... recognized by law." 5 U.S.C. § 559. The Commission has been using declaratory orders for nearly half a century, *see Atlantic Freight Lines, Inc.—Petition for Declaratory Order,* 51 M.C.C. 175, 185 (1949). The Supreme Court has assumed the practice to be proper. *See Service Storage & Transfer Co. v. Virginia,* 359 U.S. 171, 177–79, 79 S.Ct. 714, 718–19, 3 L.Ed.2d 717 (1959). *See also Merchants Fast Motor Lines, Inc. v. ICC,* 5 F.3d 911, 915–16 (5th

and the case is remanded to the Commission for further proceedings consistent with this opinion.

*So ordered.*

Cir.1993); KENNETH CULP DAVIS, ADMINISTRATIVE LAW TREATISE § 4.10, at 201 (1970 Supp.). We see no reasons why—the union has not suggested any—the Commission's declaratory procedure is less satisfactory than the procedure the union advocates, that is, the filing of a formal application for Commission approval of the transaction accompanied by a motion to dismiss the applica-tion for lack of jurisdiction. *Cf.* 5 U.S.C. § 706, requiring reviewing courts to take due account of the "rule of prejudicial error." Either way the jurisdictional question will be presented. The Commission's declaratory procedure at least dispenses with what may prove to be unnecessary paperwork and streamlines the agency's jurisdictional determination.