[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 06-14357

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEB 10, 2009
THOMAS K. KAHN
CLERK

Tax Court No. 8506-03

COMMISSIONER OF INTERNAL REVENUE,

Petitioner-Appellant,

versus

RUTH E. NEAL,

Respondent-Appellee.

_____

Appeal from the Decision of the
United States Tax Court

_____

**(February 10, 2009)**

Before TJOFLAT, HULL and WILSON, Circuit Judges.

WILSON, Circuit Judge:

The Commissioner of the Internal Revenue Service (the "IRS") appeals the

decision of the Tax Court granting Ruth E. Neal equitable relief pursuant to the innocent spouse provision of Internal Revenue Code, 26 U.S.C. § 6015(f), for the portion of unpaid federal income taxes attributable to the income of Neal's ex-husband for tax years 1993, 1994, and 1995. The total amount in controversy, exclusive of interest and penalties, is $278,996.

In this case, the Tax Court conducted a trial and granted Neal equitable relief. Both parties agree that the Tax Court appropriately used an abuse of discretion standard of review and that Neal at trial had to establish the Commissioner abused its discretion in denying her relief. They disagree about whether the Tax Court at trial may consider evidence not included in the administrative record or is limited to consideration of the administrative record.

Neal submits that the Tax Court properly followed its precedent in *Ewing v. Commissioner*, 122 T.C. 32 (2004), *rev'd on other grounds*, 439 F.3d 1009, 1014 (9th Cir. 2006), and *Porter v. Commissioner*, 130 T.C. No. 10, 2008 WL 2065189 (Tax Ct. May 15, 2008), wherein the Tax Court held that in § 6015(f) cases it may conduct a "trial *de novo*" and consider evidence not included in the administrative record before the Commissioner. The Tax Court uses the term "trial *de novo*" to describe the form of its proceeding and applies an abuse of discretion standard of review in that trial *de novo* proceeding. However, the Commissioner contends that the Administrative Procedure Act ("APA") governs all agency proceedings and

2

thus, the scope of the Tax Court's inquiry is confined strictly to the administrative record.

This issue has divided the fourteen members of the Tax Court: the twelve judges in the *Ewing/Porter* majority concluded the Tax Court's determination of equitable relief in § 6015 cases is made in a trial *de novo* and is not confined to the administrative record. Eleven of these twelve believe that (1) a trial *de novo* gives effect to the congressional mandate in § 6015(e) that the Tax Court "determine the appropriate relief available to [an] individual" in § 6015 equitable relief cases, (2) the Tax Court's 75-year history of conducting trials *de novo* under other statutes authorizing the Tax Court to make "determinations" of relief was well established when Congress enacted § 6015(e) using the "determine" language, and (3) the APA's record rule, limiting review to the administrative record, does not apply to the Tax Court's § 6015(e) determinations. Two members dissented and prefer a scope of Tax Court review limited to the administrative record.

We summarize § 6015, the statute at issue, the facts, and the procedural history in Part I. In Part II, we hold that the Tax Court did not err in refusing to limit its consideration to the administrative record and in conducting a trial *de novo* in this § 6015 case. In Parts III and IV, respectively, we hold that the Tax Court did not abuse its discretion in determining that Neal is entitled to equitable relief and we affirm the Tax Court's judgment.

I.

A.

Section 6015, through which Neal seeks relief, was added to the Internal Revenue Code in 1998 to broaden existing innocent spouse relief from joint and several liability. Congress first imposed joint and several liability on joint filers of tax returns in 1938. Revenue Act of 1938, Pub. L. No. 75-289, § 51(b), 52 Stat. 447, 476 (1938). Until the 1960s, the fairness of this concept was rarely questioned. In 1961, the Supreme Court held that embezzled funds were taxable. *James v. United States*, 366 U.S. 213, 221, 241, 81 S. Ct. 1052, 1056, 1067 (1961). Because many embezzlers were insolvent, the IRS began assessing underpayment of taxes to the joint filers of embezzlers, even if the spouses knew nothing of the embezzlement and had received none of the embezzled funds. *See, e.g., Huelsman v. Comm'r*, 416 F.2d 477, 478 (6th Cir. 1969); *Horn v. Comm'r*, 387 F.2d 621, 622-23 (5th Cir. 1967); *Moore v. United States*, 360 F.2d 353, 357 (4th Cir. 1966). Congress responded by adding to the I.R.C. § 6013(e), which allowed relief from joint liability in certain cases if (1) the underpayment was due to fraud on the part of the taxpayer's spouse; (2) the taxpayer did not know and had no reason to know of the underpayment; and (3) after considering the facts and circumstances, including whether the taxpayer benefitted from the underpayment, it was inequitable to hold the innocent spouse liable for the underpayment. Innocent

4

Spouse Act of 1971, Pub. L. No. 91-679, 84 Stat. 2063, 2063-64 (1971).   In 1984,

Congress amended § 6013(e) and slightly broadened the grant of relief.  Pub. L.

No. 98-369, § 424(a), 98 Stat. 494, 801 (1984).

Congress repealed § 6013(e) and enacted § 6015 in the Internal Revenue

Service Restructuring and Reform Act of 1998 to make "innocent spouse status

easier to obtain."  H.R. REP. NO. 105-599, at 249-51 (1998) (Conf. Rep.), *reprinted*

*in* 1998 U.S.C.C.A.N. 288.  Because this case involves § 6015(e) and (f), we quote

those two subparts, which provide in pertinent part:

> (e) Petition for review by Tax Court.--
>       (1) In general.--In the case of an individual against whom a
> deficiency has been asserted and who elects to have subsection (b) or
> (c) apply, or in the case of an individual who requests equitable relief
> under subsection (f)--
>                   (A) In general.--In addition to any other remedy
> provided by law, the individual may petition the Tax Court (and the
> Tax Court shall have jurisdiction) to determine the appropriate relief
> available to the individual under this section . . . .
> (f) Equitable relief.--Under procedures prescribed by the Secretary, if–
>       (1) taking into account all the facts and circumstances, it is
> inequitable to hold the individual liable for any unpaid tax or any
> deficiency (or any portion of either); and
>       (2) relief is not available to such individual under subsection (b)
> or (c),
> the Secretary may relieve such individual of such liability.

26 U.S.C. § 6015(e) and (f).

We start with subpart (f) of § 6015, which authorizes the Commissioner to

grant equitable relief.  Specifically, the Commissioner may grant relief to a

5

taxpayer if, under procedures prescribed by the Commissioner, it would be "inequitable to hold the individual liable for any unpaid tax or any deficiency (or any portion of either)" and relief would not be available under subsection (b) or (c). 26 U.S.C. § 6015(f). The parties agree that relief is not available to Neal under § 6015(b) and (c), and that Neal may properly seek equitable relief under § 6015(f) as an alleged innocent spouse.[1]

In addition, subpart (e) of § 6015 authorizes a taxpayer who has been denied relief pursuant to subparts (b), (c), or (f) to petition the Tax Court for relief. Section 6015(e) expressly grants jurisdiction to the Tax Court to "determine the appropriate relief available to the individual." 26 U.S.C. § 6015(e). Section 6015(e) does not say the taxpayer "may appeal" the Commissioner's § 6015(f) decision to the Tax Court or that the Tax Court may hear an appeal. Rather, § 6015(e) authorizes the taxpayer to seek § 6015(f) relief from the Tax Court.[2] *Id.*

---

[1]Section 6015 provides three distinct types of relief for taxpayers who file joint returns. Subpart (b) of § 6015 provides relief to those taxpayers who can meet certain requirements, such as: (1) an understatement of income attributable to erroneous items; (2) that the taxpayer "did not know, and had no reason to know" of the understatement; and (3) that it would be inequitable to hold the taxpayer liable for the deficiency. 26 U.S.C. § 6015(b). Subpart (c) of § 6015 permits a taxpayer who is no longer married to or is legally separated from his/her spouse to elect to limit liability for any deficiency attributable to the spouse to the taxpayer's separate liability amount in certain situations. 26 U.S.C. § 6015(c).

Subpart (f) applies when relief is not available under § 6015(b) or (c). 26 U.S.C. § 6015(f). Subpart (f) applies to Neal's case because she seeks equitable relief from an unpaid tax, i.e., an underpayment of taxes shown on the return but not paid with the return.

[2]In its Brief to this Court, the Commissioner argued that § 6015(e) did not grant the Tax Court subject matter jurisdiction over § 6015(f) requests. During the briefing stage of this case, Congress amended § 6015(e) to explicitly grant the Tax Court jurisdiction over § 6015(f) cases.

Section 6015(e) also states that a petition for relief from the Tax Court is "[i]n addition to any other remedy provided by law." *Id.*

B.

Neal and her ex-husband Alimam Neal ("Alimam") married in 1976, resided together until 1996, and divorced in 1998. During the marriage, the couple kept largely separate finances, maintained separate checking accounts, and rarely discussed their financial arrangements.[3] Neal, a radiologist employed by the Medical College of Georgia, paid most of the family expenses, including half of the monthly mortgage payment, groceries, and schooling and activities for the couple's three children. Alimam, a self-employed anesthesiologist, paid the other half of the mortgage, the housekeeper, and the utilities and car payments. Despite Neal's requests to Alimam, she was not privy to the financial aspects of Alimam's business.

---

Tax Relief and Health Care Act of 2006, Pub. L. No. 109-432, Div. C, § 408, 120 Stat. 2922, 3061-62 (2006). More specifically, in § 6015(e), Congress added, "or in the case of an individual who requests equitable relief under subsection (f)" after "who elects to have subsection (b) or (c) apply." *Id.* The Commissioner subsequently withdrew this jurisdiction challenge. The Commissioner's remaining claims are: (1) that under § 6015(e) the Tax Court has jurisdiction in innocent spouse cases but its review is confined to consideration of the administrative record, and (2) alternatively, even if the Tax Court appropriately considered evidence outside the administrative record, it nevertheless erred in concluding that the Commissioner's denial of equitable relief was an abuse of discretion.

[3]The majority of the facts recited here are from the Tax Court's findings. It is unclear from the administrative record whether Neal disclosed her financial history and these facts to the IRS in her initial interview because no transcript of the interview exists.

Neal relied upon Alimam and his accountant to prepare and file the couple's joint federal income tax returns. She merely gave Alimam her W-2 forms and then signed the returns once Alimam received them from the accountant.[4] Neal never spoke to the accountant nor did she examine the completed tax returns. Neal "imagined" that Alimam properly submitted their financial information to the accountant and filed the returns.

In fact, Alimam mailed the completed returns but, unbeknownst to Neal, assiduously failed to include payment of taxes relating to his income. Thus, while Neal's employer appropriately withheld taxes from Neal's salary, the portion of the taxes attributable to Alimam's business went unpaid.

Neal first learned that the couple owed money to the IRS when they sought bankruptcy protection in 1989. Alimam falsely told Neal that the IRS was a creditor because it disallowed certain tax shelters. The bankruptcy hearings revealed that Alimam had purchased in his name, without informing Neal, a boat, a Colorado villa, six or seven cars, and expensive fine art. After the bankruptcy, their home was foreclosed and their cars were repossessed. Over the next several years, Neal's wages were garnished, and she pawned a diamond ring to pay back taxes and a Rolex watch to pay utility bills.

---

[4]At the Tax Court trial, Neal presented evidence, not previously presented to the Commissioner, that Alimam forged Neal's signature on the 1993 and 1995 returns.

In 1993, the IRS audited the couples' 1990, 1991, and 1992 returns. Though the couple signed the audit report, they did not make any payments toward the back taxes assessed. The couple again filed for bankruptcy in 1995 and the IRS sought underpaid taxes from 1990 to 1993. Alimam falsely claimed to Neal that the IRS had not permitted certain business expenses resulting in the delinquencies.

The second garnishment of Neal's wages in 1996 finally prompted Neal to investigate the reasons underlying the couple's financial turmoil. When questioned, the accountant and bankruptcy attorney disclosed that Alimam had never paid his income taxes. The Commissioner had not contested any of the couple's joint returns, nor had it asserted any deficiencies. Rather, the Commissioner sought to collect $278,996 in unpaid taxes, including interest and penalties. The back taxes due to the IRS (without interest and penalties) are as follows: for 1993, $52,689; for 1994, $31,191; and, for 1995, $20,039.[5]

In July 1996, Neal left the marital home with their children and sued for divorce because of Alimam's adulterous relationships and financial

---

[5]Neal's employer withheld adequate taxes from Neal's salary, and thus almost all of the underpayments are due to Alimam's salary and his failure to withhold or pay taxes thereon.

| | Taxpayer | | | Alimam | | | Joint |
|------|----------|----------|--------------|----------|----------|--------------|---------------|
| Year | Earned | Est. sep. | Tax Withheld | Earned | Est. sep. | Tax Withheld | Tax Liability |
| 1993 | $110,163 | $21,987 | $20,302 | $154,316 | $51,004 | 0 | $72,991 |
| 1994 | 116,759 | 23,459 | 21,711 | 106,180 | 29,443 | 0 | 52,902 |
| 1995 | 122,693 | 25,194 | 23,221 | 78,310 | 18,066 | 0 | 43,260 |

Neal paid federal income taxes of $173,453 in the years 1999 through 2003. The total amount of state and federal taxes, social security withholding and medicare withholding paid by Neal during the same period totaled $249,752, or 32.83% of her gross income.

mismanagement. Unknown to Neal, Alimam was supporting another woman who bore his child and his share of the tax liability was channeled to his secret life and support of his second family. At the conclusion of the 1998 divorce proceeding, Alimam was ordered to pay all past and future tax liabilities incurred by the couple during their marriage. Alimam made minimal payments to the IRS and the majority of the unpaid taxes are outstanding. Alimam made sporadic child support payments of $3,000 per month until he lost his job in 2001. After the divorce, Neal financially supported herself, one child who lived at home, and two adult children.

C.

On February 8, 2000, Neal petitioned the Commissioner, under § 6015(f), for equitable relief from joint and several liability for the portion of the unpaid taxes attributable to Alimam's income. *See* 26 U.S.C. § 6015(f). Neal did not contest payment of approximately $5,400, the portion of the underpayment attributable to her income. Neal requested relief because she signed the tax returns "believing that my then-husband was paying any amounts indicated as owed by the tax return."

Neal responded to a written questionnaire sent by the IRS in which she represented that she was not involved with the preparation of tax returns, did not discuss the tax returns with Alimam, and did not review the tax returns. Neal then met with an IRS examining agent and related some of the foregoing facts. Neither

10

a court reporter nor an attorney were present, and no recording was made of this interview. On August 9, 2001, the examining agent denied relief because the agent determined, "[Neal] knew that an underpayment existed when the tax returns were signed; that no economic hardship would exist [if Neal were required to pay the back taxes] and a portion of the tax is attributable to [Neal]."

Neal protested the determination to the IRS Office of Appeals ("Appeals"). Appeals echoed the examining agent's conclusions and issued a notice of determination on April 22, 2003, denying Neal's request for equitable relief. Appeals found that Neal was aware of the underpayment of taxes because the IRS had been a creditor in the 1989 and 1995 bankruptcy actions, the IRS had garnished her salary twice, and Neal had signed the 1994 audit report which indicated the underpaid amounts. Appeals also found that Neal would not suffer economic hardship if relief was withheld because Neal "enjoy[ed] an upper middle income standard of living" based on her salary of $129,000 per year and child support payments of $36,000 per year.

Neal sued in the Tax Court to contest the Commissioner's denial of equitable innocent spouse relief. At a pre-hearing conference with the Tax Court, the Commissioner took the position that the Tax Court's review was limited to the administrative record. The Tax Court disagreed based on its previous decision in *Ewing*, 122 T.C. at 44, and stated that the Tax Court's review and determination

11

was not limited to the administrative record but was *de novo*. *See also Porter*, 130 T.C. No. 10, 2008 WL 2065189, at \*2 (upholding the *Ewing* analysis). Accordingly, the Tax Court agreed to entertain testimony and other evidence the parties wished to introduce. *See* § 6015 (e)(1)(A) (authorizing the Tax Court "to determine the appropriate relief available to [an] individual" under § 6015(f)). As provided in *Ewing*, the Tax Court's longstanding rule and practice has been to hold trials *de novo* in situations where it makes determination and redeterminations, including § 6015(f) cases. *Ewing*, 122 T.C. at 40-41. To prevail in the trial *de novo*, the taxpayer petitioner must show that the Commissioner's denial of equitable relief was an abuse of discretion. *Id.* at 36-37, 39-40; *see Mitchell v. Comm'r*, 292 F.3d 800, 807 (D.C. Cir. 2002).

The Tax Court heard the testimony of two witnesses: Ruth Neal and Gloria Spann.[6] Neal recited the facts summarized above. In addition, to support her position that payment of back taxes would result in an economic hardship, Neal testified that she earned $174,940 in 2003 and had expenses of $158,570.81 for household necessities in that same year. In response, the Commissioner called Spann, a revenue officer (but not the one who initially reviewed Neal's petition for relief). The Commissioner asked Spann to explain the meaning of "economic

---

[6]At trial, the parties also submitted the administrative record to the Tax Court.

12

hardship" according to the Internal Revenue Manual. The Revenue Guidelines specified that individuals with a salary exceeding $5,834 per month were expected to subsist on $2,821 per month. Because Neal spent more than $2,821 per month, Spann testified that requiring Neal to pay the delinquencies would not result in an economic hardship.

After hearing the evidence, the Tax Court issued a Memorandum finding that Neal did not have knowledge of the unpaid taxes because "among other things, the filed tax returns accurately reflected the correct tax liabilities, nonpayment of the balances of the taxes shown to be due on the returns was concealed by Alimam, and [Neal] was not otherwise put on notice of the nonpayment." The Tax Court also found that the facts before it were "inconclusive as to the degree to which [Neal] would suffer economic hardship if she were denied relief from joint liability." Taking into account "all the facts and circumstances," the Tax Court also found that it would be inequitable to hold Neal liable for the tax balances due for 1993, 1994, and 1995 and noted particularly the following:

> Alimam's legal obligation relating to the unpaid taxes, the fact that the taxes in issue are attributable to Alimam's income, Alimam's deception with regard to his investments and nonpayment of the taxes due, the absence of any significant benefit to petitioner from Alimam's failure to pay the taxes, Alimam's exclusion of petitioner from the tax return preparation process and from his financial affairs, petitioner's payment of the majority of the family's expenses and her continued support of the children, and petitioner's payment every year of the Federal income taxes attributable to her income.

13

The Commissioner timely appealed.

## II.

"[W]e review Tax Court decisions 'in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury.'" *L.V. Castle Inv. Group, Inc. v. Comm'r*, 465 F.3d 1243, 1245 (11th Cir. 2006) (quoting 26 U.S.C. § 7482(a)(1)).  Accordingly, we review interpretations of the Internal Revenue Code *de novo*, and "we review the [tax] court's decision to grant or deny equitable relief for abuse of discretion, reviewing underlying questions of law *de novo* and findings of fact upon which the decision to grant equitable relief was made under the clearly erroneous standard."  *Atlanta J. & Constitution v. City of Atlanta Dep't of Aviation*, 442 F.3d 1283, 1287 (11th Cir. 2006) (citations omitted); *see Cheshire v. Comm'r*, 282 F.3d 326, 332, 338 (5th Cir. 2002).  Whether the Tax Court in a § 6015(e) case may conduct a trial *de novo* or is confined to considering only the administrative record presents a question of law which this Court reviews *de novo*.[7]

---

[7]By way of background, we review the development of the Tax Court.  In 1924, Congress established the Board of Tax Appeals to allow taxpayers to challenge deficiency determinations prior to paying the contested amount.  Pub. L. No. 68-176, § 900, 43 Stat. 253, 308, 336-338 (1924); S. Rep. No. 68-398, at 8 (1924).  The Board was an independent agency in the executive branch of government.  *Id.*  Though not a judicial body, on appeals of such determinations, the Board was authorized to hear cases, administer oaths, and examine and subpoena witnesses.  *Id.*

The Board's jurisdiction was expanded in 1926 to determine overpayment of taxes and again in 1942 to determine refunds of processing taxes.  Revenue Act of 1926, Pub. L. No. 69-20, § 284(a), 44 Stat. 9, 66-67 (1926); Revenue Act of 1942, Pub. L. No. 77-753, § 510, 56 Stat.

Joint taxpayers are normally jointly and severally liable for the full amount of federal income taxes due, but may be relieved of joint and several liability under the limited circumstances described in § 6015(b), (c), and (f).  As noted earlier, § 6015(f) permits the Commissioner to grant equitable relief to an innocent spouse "for any unpaid tax or any deficiency" if "taking into account all the facts and circumstances, it is inequitable to hold the individual liable" and if "relief is not available to such individual under subsection (b) or (c)."  26 U.S.C. § 6015(f).  And as also noted above, § 6015(e), at issue here, expressly grants jurisdiction to the Tax Court "to determine the appropriate relief available to the individual" under § 6015(f).

Although the parties agree that the Commissioner's denial of equitable relief to Neal under § 6015(f) is subject to judicial review by the Tax Court, they disagree as to what the Tax Court may consider in its review.  In *Ewing*, the Tax Court held that in reviewing a denial of § 6015(f) equitable relief, it is not confined to considering only the facts presented in the administrative record below.  122

798, 967 (1942).  Congress changed the name of the Board of Tax Appeals to the "Tax Court of the United States" in 1942, but retained the Board's status as an executive agency.  Revenue Act of 1942, Pub. L. No. 77-753, § 504, 56 Stat. 798, 957 (1942).

In 1969, the Tax Court took its present form when Congress established an Article I court of record named the "United States Tax Court" to replace the Tax Court of the United States.  Pub. L. 91-172, § 951, 83 Stat. 487, 730 (1969).  Congress indicated that the change was made to quell questions of propriety of one agency sitting in judgment of another agency and because the Tax Court only had judicial duties.  S. Rep. No. 91-552 (1969), *reprinted in* 1969 U.S.C.C.A.N. 2027, 2341.

T.C. at 35-36. The Tax Court reaffirmed that holding in *Porter*, 2008 WL 2065189, at *2, and applied that holding here to conduct a trial *de novo* in Neal's case, which resulted in a reversal of the Commissioner's decision to deny her equitable relief. The Commissioner urges us to disapprove the Tax Court's *Ewing/Porter* reasoning and to restrict the Tax Court's § 6015(e) review in § 6015(f) equitable relief cases to the administrative record.

We first outline the Tax Court's reasoning in *Ewing* and *Porter* for its conclusion that it may conduct a trial *de novo* in § 6015(f) cases. The *Ewing/Porter* majority focused on the statutory language in § 6015(e) and (f). The majority reasoned that, in the Internal Revenue Code, the Tax Court's role in § 6015(f) cases is prescribed by the operative terms of § 6015(e). The *Ewing* majority concluded that a *de novo* trial gave effect to § 6015(e)'s statutory mandate that the Tax Court "determine the appropriate relief available to the individual," reasoning as follows:

> Part of our interpretative responsibility here is to give proper effect to both section 6015(e) and (f). Courts attempt to read statutory provisions harmoniously, so as to give proper effect to all of the words of the statute. . . . Our de novo review of the Commissioner's determinations under section 6015(f) gives effect to the congressional mandate [in section 6015(e)] that we determine whether a taxpayer is entitled to relief under section 6015. The measure of deference provided by the abuse of discretion standard is a proper response to the fact that section 6015(f) authorizes the Secretary to provide procedures under which, based on all the facts and circumstances, the Secretary may relieve a taxpayer from joint liability. That approach

16

(de novo review, applying an abuse of discretion standard) properly implements the statutory provisions at issue here, and has a long history in numerous other areas of Tax Court jurisprudence.

We conclude that our determination whether petitioner is entitled to equitable relief under section 6015(f) is made in a trial de novo and is not limited to matter contained in respondent's administrative record, and that the APA record rule does not apply to section 6015(f) determinations in this Court.

122 T.C. at 43-44 (citations omitted).

As support for its construction of § 6015(e) and (f), the *Ewing/Porter* majority pointed to the Tax Court's seventy-five year history of conducting trials *de novo* in other areas where Congress by statute has authorized the Tax Court to make "determinations" or "redeterminations" and reasoned that Congress was well aware of the Tax Court's well-established interpretation of "determine" when it enacted § 6015 in 1998. *Ewing*, 122 T.C. at 37-39; *Porter*, 2008 WL 2065189, at *3. The *Ewing* majority explained, as follows:

Since 1924, the Tax Court (and the predecessor Board of Tax Appeals, *see Consol. Cos. v. Commissioner*, 15 B.T.A. 645, 652 (1929)) has had jurisdiction to "redetermine" deficiencies and additions to tax, secs. 6213 and 6214(a); and, since 1926, to determine overpayments, sec. 6512(b). Under section 6213(a) and its predecessors, we (and earlier, the Board of Tax Appeals) have "redetermined" deficiencies de novo, not limited to the Commissioner's administrative record, for more than 75 years.

We can presume that Congress was aware of this long history in 1998 when Congress used the word "determine" in section 6015. If Congress includes language from a prior statute in a new statute, courts can presume that Congress intended the longstanding legal interpretation of that language to be applied to the new statute. *Commissioner v. Noel's Estate*, 380 U.S. 678, 680-681, 85 S. Ct.

17

1238, 14 L.Ed.2d 159, (1965); *United States v. 101.80 Acres*, 716 F.2d 714, 721 (9th Cir. 1983).

There are other situations in which this Court makes determinations de novo. For example, section 7436(a) provides that the Tax Court may "determine" whether the Commissioner's determination regarding an individual's employment status is correct. Congress intended that we conduct a trial de novo with respect to our determinations regarding employment status. *See* H. Rept. 105-148, at 639 (1997), 1997-4 C.B. (Vol.1) 319, 961; S. Rept. 105-33, at 304 (1997), 1997-4 C.B. (Vol. 2) 1067, 1384; H. Conf. Rept. 105-220, at 734 (1997), 1997-4 C.B. (Vol. 2) 1457, 2204. As another example, section 6404 authorizes this Court to "determine" whether the Secretary's refusal to abate interest was an abuse of discretion. Our practice has been to make our determination after providing an opportunity for a trial de novo. See, e.g., *Goettee v. Commissioner*, T.C. Memo 2003-43; *Jean v. Commissioner*, T.C. Memo. 2002-256; *Jacobs v. Commissioner*, T.C. Memo. 2000-123.

Our long tradition of providing trials de novo in making our determinations, and Congress's use of the word "determine" in our jurisdictional grant in section 6015(e)(1)(A), suggest that Congress intended that we provide an opportunity for a trial de novo in making our determinations under section 6015(f).

*Ewing*, 122 T.C. at 38-39.[8]

The Tax Court in *Porter* emphasized that the jurisdiction granted in

§ 6015(e) "is couched in language similar to that" in §§ 6213, 6214, and 6512(b),

where the Tax Court has long conducted trials *de novo*, and that § 6015 "is part and

---

[8]The *Ewing/Porter* majority also cites a longstanding practice of holding trials *de novo* in many situations where the abuse of discretion standard applies to the Commissioner's conduct. *Ewing*, 122 T.C. at 39; *Porter*, 2008 WL 2065189, at *5. As aptly stated by the Tax Court, "[t]he traditional effect of applying an abuse of discretion standard in this [Tax] Court is to alter the standard of review, not to restrict what evidence we consider in making our determination." *Ewing*, 122 T.C. at 39. Thus, a trial *de novo* under § 6015 is not incompatible with abuse of discretion review.

18

parcel of the same statutory framework":

> The Code has long provided a specific statutory framework for reviewing deficiency determinations of the Internal Revenue Service. Secs. 6213 and 6214; *Ewing v. Commissioner*, 122 T.C. at 52 (Thornton, J., concurring). Section 6015 is part and parcel of the same statutory framework. Our de novo review procedures emanate from that statutory framework.
>
> Our jurisdiction under section 6015 is couched in language similar to that of our deficiency jurisdiction under section 6213 and 6214. Section 6015(e)(1)(A) authorizes this Court to "determine" the appropriate relief available under section 6015. Section 6213(a) provides that taxpayers who receive a notice of deficiency may petition this Court for a "redetermination" of the deficiency. Section 6214(a) provides this Court jurisdiction to "redetermine" the amount of the deficiency.
>
> Congress first granted the Board of Tax Appeals (the predecessor to the Tax Court) jurisdiction to "redetermine" deficiencies and additions to tax in 1924. *Ewing v. Commissioner*, 122 T.C. at 38. Since 1926 we have also had jurisdiction to "determine" overpayments. *Id.* These determinations and redeterminations have always been made de novo. *O'Dwyer v. Commissioner*, *supra* at 580; *Greenberg's Express, Inc. v. Commissioner*, 62 T.C. 324, 327-328, 1974 WL 2624 (1974); *see Clapp v. Commissioner*, 875 F.2d 1396, 1403 (9th Cir. 1989); *Raheja v. Commissioner*, 725 F.2d 64, 66 (7th Cir. 1984), affg. T.C. Memo. 1981-690; *Jones v. Commissioner*, 97 T.C. 7, 18, 1991 WL 119659 (1991). Congress has defined the jurisdiction of this Court using the words 'determine" and "redetermination." *Ewing v. Commissioner*, 122 T.C. at 38. We see no material difference between "determine" in section 6512(b), and "redetermination" in section 6213(a) for purposes of this discussion. *Id.*

*Porter*, 2008 WL 2065189, at *3. The Tax Court reasoned that "[w]e can presume that in 1998 when Congress chose to use the word 'determine' in section 6015, it did so in full awareness of our long history of de novo review," and that "[t]he use

19

of the word 'determine' in section 6015(e)(1)(A) suggests that Congress intended that we conduct trials de novo in making our determinations under section 6015(f)."  *Id.*[9]

In both *Ewing* and *Porter*, the Tax Court identified procedural anomalies that further justified its conclusion that trials *de novo* are appropriate in § 6015 equitable relief cases.  *Ewing*, 122 T.C. at 42-44; *Porter*, 2008 WL 2065189, at *6. If the Tax Court were confined to the administrative record in reviewing stand-alone § 6015(e) petitions (such as Neal's petition), inconsistent procedures would be adopted in equitable spouse relief cases.  The Tax Court gave several examples. First, by statute, when a taxpayer files an election for § 6015(f) relief with the Commissioner and the Commissioner fails to render a determination within six months, the Tax Court has jurisdiction under § 6015(e) to make a determination as to the viability of the taxpayer's petition in the absence of an administrative record. 26 U.S.C. § 6015(e)(1)(A)(i)(II).[10]  As such, confining the Tax Court to

---

[9]It is also noteworthy that 26 U.S.C. § 7453 provides that, with limited exceptions not relevant here, Tax Court proceedings shall be conducted in accordance with rules prescribed by the Tax Court and rules of evidence in trials without a jury.  Further, Congress has mandated in 26 U.S.C. § 7459 that the Tax Court make findings of fact in each report upon "any proceeding instituted before the Tax Court."  *Id.* (quotation marks omitted).  Judge Thornton, in a concurring opinion joined by five other members of the *Porter* majority, emphasized that these "[s]tatutorily mandated standards and procedures contemplate that the Tax Court will generally conduct trials de novo in its proceedings, including actions involving claims for relief from joint and several liability."  *Porter*, 2008 WL 2065189, at *12 (Thornton, J., concurring).

[10]Section 6015(e)(1)(A) provides:
In addition to any other remedy provided by law, the individual may petition the Tax

20

consideration of the administrative record in only those § 6015(f) cases in which the Commissioner has issued a determination would result in inconsistent procedural treatment of essentially identical § 6015(e) petitions. *Ewing*, 122 T.C. at 42; *Porter*, 2008 WL 2065189, at *6.

Second, in deficiency cases, the Tax Court holds a trial *de novo* even when a taxpayer raises equitable spouse relief under § 6015(f) as an affirmative defense to the deficiency case. *Ewing*, 122 T.C. at 42 (citing *Butler v. Comm'r*, 114 T.C. 287, 292 (2000)); *Porter*, 2008 WL 2065189, at *6. Again, without trials *de novo* under § 6015(e), substantially identical § 6015(f) claims would be treated differently.[11]

Third, under § 6015(e)(4), the non-requesting spouse can intervene "to become a party" when a requesting spouse's petition for equitable relief under § 6015(e) reaches the Tax Court. 26 U.S.C. § 6015(e)(4); *Ewing*, 122 T.C. at 42-

---

Court (and the Tax Court shall have jurisdiction) to determine the appropriate relief available to the individual under this section if such petition is filed--
    (i) at any time after the earlier of–
        (I) the date the Secretary mails, by certified or registered mail to the taxpayer's last known address, notice of the Secretary's final determination of relief available to the individual, or
        (II) the date which is 6 months after the date such election is filed or request is made with the Secretary, and
    (ii) not later than the close of the 90th day after the date described in clause (i)(I).
26 U.S.C. § 6015(e)(1)(A).

[11]In addition, § 6015(e)(1) itself refers to both deficiency cases where the taxpayer elects to have § 6015(b) or (c) apply and other cases where the taxpayer elects to have § 6015(f) apply. The same judicial review should be applicable in § 6015 cases, whether the innocent spouse claim is made in a stand-alone deficiency case or stand-alone unpaid tax case.

43; *Porter*, 2008 WL 2065189, at *6. The Tax Court in *Ewing* and *Porter* concluded that the fact that Congress in § 6015 provided for intervention by a non-requesting spouse as a party directly in the Tax Court also suggests that Congress intended that the Tax Court conduct trials *de novo* in § 6015 cases in order to permit intervening spouses to offer evidence to challenge the requesting spouse's entitlement to equitable relief. *Ewing*, 122 T.C. at 43; *Porter*, 130 T.C. at *6.

In summary, the Tax Court in *Ewing* and *Porter* concluded that Congress intended that taxpayers have the same opportunity for a trial *de novo* relating to § 6015(f) equitable relief (1) when that relief is raised as an affirmative defense in a deficiency proceeding, (2) in a stand-alone § 6015(e) proceeding where the Commissioner has denied § 6015(f) relief (as in this case), (3) in a stand-alone § 6015(e) proceeding where the Commissioner has failed to rule within six months, and (4) when a non-requesting spouse intervenes in the Tax Court to challenge a requesting spouse's claim to § 6015(f) relief.[12] *Ewing*, 122 T.C. at 42-43; *Porter*, 2008 WL 2065189, at *6. "Identical issues before a single tribunal should receive similar treatment." *Ewing*, 122 T.C. at 43 (quoting *Corson v. Comm'r*, 114 T.C. 354, 364 (2000)).

---

[12]The Tax Court noted that intervention by the nonrequesting spouse is available both in deficiency cases in which § 6015(f) relief is requested and in stand-alone § 6015 cases such as this case. *Ewing*, 115 T.C. at 122-23; *Porter*, 130 T.C. at *6 (both citing Rule 325); *King v. Commissioner*, 115 T.C. 118, 122-23 (2000); and *Corson v. Commissioner*, 114 T.C. 354, 364-65 (2000).

22

Finally, and of particular import here, the Tax Court explained why the APA's record rule–limiting a reviewing court to the administrative record–does not supplant the Tax Court's own longstanding trial *de novo* procedures and precedent. APA § 559 "provides that the APA does 'not limit or repeal additional requirements imposed by statute or otherwise recognized by law.'" *Porter*, 130 T.C. No. 10, 2008 WL 2065189, at *4 (quoting 5 U.S.C. § 559). In both *Ewing* and *Porter* the Tax Court specifically discussed how its trial *de novo* procedures for reviewing IRS decisions were "well-established" and "recognized by law" before the enactment of the APA in 1946. *Id.*; *Ewing*, 122 T.C. at 52 (Thornton, J., concurring).[13] According to the Tax Court, its trial *de novo* procedures have remained virtually unchanged since the APA's enactment, supporting its conclusion that the APA did not limit or repeal the Tax Court's *de novo* review procedures. *Ewing*, 122 T.C. at 38-40.

The fact that the APA (enacted in 1946) predates § 6015 (enacted in 1998) does not change the result because § 6015 is "part and parcel" of the statutory framework for Tax Court review of IRS deficiency determinations. *Ewing*, 122 T.C. at 52-53 (Thornton, J., concurring); *Porter*, 2008 WL 2065189, at **3-4. It is from this framework that the "[Tax Court's] de novo review procedures emanate."

---

[13]Eleven members of the Tax Court joined Judge Thornton's concurrence in *Ewing*. 122 T.C. at 56.

23

*Ewing*, 122 T.C. at 52 (Thornton, J., concurring); *Porter*, 2008 WL 2065189, at *3.

Accordingly, when Congress chose to use the same statutory language in § 6015 as

it used in establishing the longstanding trial *de novo* procedure for deficiency

actions, "it did so in full awareness of [the Tax Court's] long history of de novo

review," *Porter*, 2008 WL 2065189, at *3, and did not intend to impose a different

procedure. Thus, per § 559, "the APA does not disturb or supersede [the Tax]

Court's longstanding de novo judicial review procedures for cases involving

spousal relief under section 6015." *Ewing*, 122 T. C. at 54 (Thornton, J.,

concurring).

The Tax Court also explained that "[a]s a statute of general application, the

APA does not supersede specific statutory provisions for judicial review" such as

Congress has granted to the Tax Court. *Porter*, 2008 WL 2065189, at *2. The Tax

Court pointed out that "nothing in section 6015 or its legislative history indicates

that the APA is to apply to section 6015 cases or that we are to restrict our review

to the administrative record." *Id.* at *4.[14] Moreover, the Tax Court emphasized

that the legislative history of the APA confirms it does not supersede the Tax

---

[14]In *Porter*, the Tax Court also contrasted its statutory § 6015 jurisdiction, which has no limitations written into the statute, with its jurisdiction to issue declaratory judgments relating to the status, qualification, valuation, or classification of certain § 501(c)(3) organizations, retirement plans, gifts, and governmental obligations. *Porter*, 133 T.C. at *4. The Tax Court pointed out (1) that it has adopted rules regarding declaratory judgments that generally require such actions to be disposed of on the basis of the administrative record, and (2) that "[t]he reason for this limited review lies in Congress's legislative directive," discussed in *Porter*, but (3) that Congress did not impose a similar restrictive standard in § 6015. *Id.*

Court's adjudication procedures, stating:

> The legislative history of the APA confirms this understanding.  See S. Comm. on the Judiciary, 79th Cong., 1st Sess., Administrative Procedure Act (Comm. Print 1945), reprinted in Administrative Procedure Act Legislative History, 1944-46, at 22 (1946) (stating that there are exempted from APA formal adjudication requirements matters that are subject to de novo review of facts and law such "as the tax functions of the Bureau of Internal Revenue (which are triable de novo in The Tax Court)"); S. Rept. 752, 79th Cong., 1st Sess. (1945), reprinted in Administrative Procedure Act Legislative History, 1944-46, at 214 (1946) (explaining that pursuant to APA provisions governing the scope of judicial review, courts establish facts de novo where the agency adjudication is not subject to APA formal adjudication provisions "such as tax assessments * * * not made upon an administrative hearing and record, [where] contests may involve a trial of the facts in the Tax Court"); H. Rept.1980, 79th Cong., 2d Sess. (1946), reprinted in Administrative Procedure Act Legislative History, 1944-46, at 279 (1946) (same).

*Ewing*, 122 T.C. at 53 (Thornton, J., concurring) (alterations in original).[15]  That the APA effectively exempted the Tax Court does not mean it exempted the Tax Court only as to tax matters extant in 1946.

We are persuaded by the Tax Court's reasoning.  Congress's use of the word "determine" and not "appeal" in § 6015(e)'s jurisdictional grant is significant.  And, most importantly, § 6015(e) must be read and considered with the other § 6015 provisions, such as § 6015(e)(4) outlining intervention by the non-requesting

---

[15]We quote what the Tax Court said but note that the pertinent legislative history of the APA being referenced states more fully:  "[W]here adjudications such as tax assessments are not made upon an administrative hearing and record, contests may involve a trial of the facts in the Tax Court or the United States district courts."  S. Rep. No. 79-752, at 214 (1945), *reprinted in* Administrative Procedure Act Legislative History at 214.

spouse and § 6015(e)(1)(A)(i)(II) authorizing a petition to the Tax Court if the Commissioner has not acted in six months. Congress also enacted § 6015 with knowledge of the Tax Court's precedent and history of conducting trials *de novo* in making its determinations. As the Tax Court noted, § 6015 was enacted "as part and parcel of," and with similar language to, the statutory framework for the Tax Court's review of deficiency determinations, which determinations had been made using trials *de novo* long before the passage of the APA.[16] The legislative history of the APA contains a clear intent to exempt the Tax Court. At a minimum, the Commissioner has not shown the Tax Court erred in its *Ewing* and *Porter* rulings that it followed in this case.[17]

---

[16]For this reason, the dissent is incorrect that our analysis "seems to authorize use of [the] APA § 559 exception in all statutes, without regard to whether the provision at issue was enacted before or after the APA."

The Supreme Court's opinion in *Dickinson v. Zurko*, 527 U.S. 150, 119 S. Ct. 1816 (1999), discussed by the dissent, does not undercut our reasoning. *See Dickinson*, 527 U.S. at 152, 119 S. Ct. at 1818 (concluding that APA § 706 applies to the Federal Circuit's review of findings of fact made by the Patent and Trademark Office). *Dickinson*, as the dissent correctly notes, did not concern a statute enacted after the APA. Instead, it concerned a heightened scope of review standard that the Federal Circuit's predecessor court supposedly applied at the time the APA was enacted. *Id.* at 154-55, 119 S. Ct. at 1819. The Supreme Court concluded that the purported standard was not "recognized" by the Federal Circuit's predecessor at that time and therefore could not qualify as an "additional requirement[] . . . recognized by law" for purposes of the APA § 559 exception. *Id.* at 161, 119 S. Ct. at 1822. Because the Supreme Court in *Dickinson* was not faced with a post-APA statute, the case offers no hindrance to our conclusion that Congress intended the Tax Court to have authority to conduct trials *de novo* in § 6015(f) cases, notwithstanding the statute's enactment after the APA, because it was part and parcel of, and similar in language to, a statutory framework under which trials *de novo* were recognized in the pre-APA era.

[17]We are unpersuaded by our dissenting colleague's concern that recognizing Congress's intent to permit the Tax Court to conduct trials *de novo* in § 6015(f) cases will "decimate[] the Commissioner's incentive to be impartial and thorough" in making his § 6015(f) determinations.

26

We recognize that the Commissioner does cite the Eighth Circuit's decision in *Robinette v. Commissioner*, 439 F.3d 455, 461 (8th Cir. 2006), *rev'g* 123 T.C. 85 (2004), but that decision, if anything, helps Neal. *Robinette* involved a claim under § 6330—not § 6015(e) and (f). Section 6330 affords taxpayers notice and a right to a hearing before the IRS can levy on and sell a taxpayer's property for unpaid taxes. 26 U.S.C. § 6330. If the taxpayer requests a hearing, an employee or officer in the IRS Office of Appeals who had no prior involvement with the unpaid tax hears the matter and determines whether the requirements of the applicable law or administrative procedure were met as to the unpaid tax. *Id.* § 6330(b)(1), (3), § 6330(c)(1), (3). This is known as a collection-due-process hearing. Section 6330(c)(3) provides that the "determination by [the] appeals officer" shall take certain listed factors into consideration. *Id.* § 6330(c)(3). Then § 6330(d)(1) provides that the taxpayer, within 30 days of the appeal officer's "determination,"

---

First, we disagree with the dissent's contentions that (1) trials *de novo* render a "farce" the requirement that the Tax Court give discretionary weight to the Commissioner's findings, and (2) under a trial <u>de novo</u> evidentiary scheme the Commissioner will "know[] that his review of the facts and law will be ignored." The Tax Court is quite capable of combining a trial *de novo* scope of evidentiary consideration with an abuse of discretion standard of review; in fact, it has an extensive history of doing so. *See Ewing*, 122 T.C. at 39 (stating that the Tax Court's "longstanding practice has been to hold trials de novo in many situations where an abuse of discretion standard applies" and listing examples); *Porter*, 2008 WL 2065189, at *5 (same). Moreover, we reject the dissent's speculation that the Tax Court's ability to hear evidence not contained in the administrative record can or will result in the Commissioner's abdication of his duty to "conduct his [§ 6015(f)] hearings in a careful and diligent manner."

27

may "appeal such determination" to the Tax Court. *Id.* § 6330(d)(1).[18]

This "appeal" language in § 6330 is materially different from § 6015(e), which does not use the word "appeal" but instead authorizes the Tax Court to "determine" the appropriate relief. This shows that Congress knows how to use the term "appeal" and that Congress meant something different when it authorized the Tax Court in § 6015(e) "to determine the appropriate relief available" to a taxpayer. *Id.* § 6015(e). In § 6330(d), Congress chose not to use the word "determine" or some derivation thereof and instead chose to vest the Tax Court with jurisdiction over a taxpayer's "appeal." For that reason, *Robinette*'s interpretation of § 6330 does not undercut, and in fact is consistent with, our reading of § 6015. *See Porter*, 2008 WL 2065189, at *3.

For all of these reasons, we agree with Neal that the Commissioner has not

---

[18]I.R.C. § 6330(d) provides, in relevant part:
(d) Proceeding after hearing.--
> (1) Judicial review of determination.--The person may, within 30 days of a determination under this section, appeal such determination to the Tax Court (and the Tax Court shall have jurisdiction with respect to such matter).
> (2) Jurisdiction retained at IRS Office of Appeals.--The Internal Revenue Service Office of Appeals shall retain jurisdiction with respect to any determination made under this section, including subsequent hearings requested by the person who requested the original hearing on issues regarding--
>> (A) collection actions taken or proposed with respect to such determination; and
>> (B) after the person has exhausted all administrative remedies, a change in circumstances with respect to such person which affects such determination.

shown that the Tax Court erred by refusing to limit its consideration to the administrative record and by conducting a trial *de novo* in this § 6015(f) case.

## III.

The Commissioner alternatively contends that even under trial *de novo* review, the Tax Court erred in concluding that the Commissioner abused his discretion in denying equitable relief to Neal. We disagree.

Section 6015(f) expressly authorizes the Commissioner to prescribe procedures for determining qualification for equitable relief. Under Revenue Procedure 2000-15, 2000-1 C.B. 447, equitable relief will be granted where (i) the couple has divorced or has not lived together for a year prior to the request for relief; (ii) "[a]t the time the return was signed, the requesting spouse had no knowledge or reason to know that the tax would not be paid"; and (iii) the requesting spouse will suffer economic hardship if the relief is not granted. Rev. Proc. 2000-15, § 4.02, 2000-1 C.B. at 448. If a requesting spouse does not qualify for relief under § 4.02, she may still qualify for relief under § 4.03, which sets forth a partial, non-exhaustive list of factors, no one of which is determinative.[19] Some

_____

[19]Under Revenue Procedure 2000-15, § 4.03, factors weighing in favor of relief include (1) if the requesting spouse is separated or divorced from the non-requesting spouse; (2) if the requesting spouse would suffer economic hardship in the absence of relief; (3) if the requesting spouse suffered abuse at the hands of the non-requesting spouse; (4) if the requesting spouse had no knowledge or reason to know that the liability would not be paid; (5) if the non-requesting spouse has a legal obligation to pay the outstanding liability; and (6) if the liability for which relief is sought is attributable solely to the non-requesting spouse.

Further, if the spouse has significantly benefitted, beyond normal support, from the

factors weigh in favor of relief and some weigh against; the Commissioner must take into account all the facts and circumstances, considering and weighing all factors appropriately. *Id.* at 449. The taxpayer has the burden of demonstrating that relief should be granted. *Cheshire v. Comm'r*, 282 F.3d 326, 332 (5th Cir. 2002); *Ewing*, 122 T.C. at 36-37.

Here, the Commissioner reasoned that Neal was not entitled to relief because (1) when she signed the return, she should have known that the tax was unpaid based on the couple's prior bankruptcy filings, and (2) that no economic hardship would befall her if she had to pay the remaining tax liability. After hearing the evidence at trial, including Neal's testimony, the Tax Court found that the record was "inconclusive" as to the existence of economic hardship. But the Tax Court also found that most of the § 4.03 factors weighed in favor of granting Neal relief. First, Alimam has a legal obligation to pay the unpaid taxes. Next, the couple is divorced. Almost all of the underpayments were attributable only to Alimam. Further, Neal received no significant benefit from the unpaid taxes and has made a good faith effort to comply with federal tax laws with regard to her income throughout her marriage and in subsequent years.[20] Even now, the only two

---

unpaid liability, or the requesting spouse has failed to comply with federal income tax laws, those factors would weigh against granting relief. Rev. Proc. 2000-15, § 4.03, 2000-1 C.B. 447, 448-49.

[20]*See* footnote 5 *supra*.

30

contested factors are whether Neal knew or should have known about Alimam's underpayment, and whether Neal would suffer economic hardship if not granted relief.

In considering "knowledge or reason to know of underpayment," relevant factors include: "(1) the alleged innocent spouse's level of education; (2) the spouse's involvement in the family's business and financial affairs; (3) the presence of expenditures that appear lavish or unusual when compared to the family's past levels of income, standard of income, and spending patterns; and (4) the culpable spouse's evasiveness and deceit concerning the couple's finances." *Kistner v. Comm'r*, 18 F.3d 1521, 1525 (11th Cir. 1994). The Commissioner points to Neal's knowledge that Alimam filed for bankruptcy in 1989 and 1995 (and the levying of Neal's salary) as evidence that Neal should have known about Alimam's lack of trustworthiness as to tax matters. As the Tax Court noted, however, the couple's filed tax returns accurately reflected their tax liabilities. The couple also maintained separate personal finances, and, although Neal asked, Alimam refused to share information about his business finances. Further, Alimam lied to Neal about the reason the IRS was a creditor in the 1989 bankruptcy, falsely telling her that the IRS had disallowed certain tax shelters, resulting in a tax deficiency. Because Neal knew others who ended up owing large amounts of taxes

31

after investing in tax shelters, she believed Alimam's explanation.[21] Although Neal became aware during the 1989 bankruptcy of some of Alimam's lavish expenses, Neal did not know how much Alimam made in his anesthesiology practice and real estate investments and thus whether his income might support those purchases. Furthermore, Alimam contributed much less than Neal to the family expenses, making it reasonable to assume he had more discretionary income. Given Alimam's general level of deceit, we cannot say that the Tax Court abused its discretion in finding that Neal did not know, nor should she have known, when she signed the 1990-93 tax returns that Alimam would not pay the tax balances shown on them.

With regard to the economic hardship factor, economic hardship is generally defined as the inability to meet "reasonable basic living expenses." *See* Treas. Reg. § 301.6343-1(b)(4). The Tax Court held that the facts were inconclusive as to the degree to which Neal would suffer economic hardship if she were denied relief. According to the Commissioner, sufficient evidence exists to sketch some picture of Neal's net worth—specifically, the Commissioner points to Neal's substantial salary, which in 1996 was $127,103 and had risen to $174,940 in 2003. Yet Neal

---

[21]During the 1995 bankruptcy, Alimam again lied to Neal, falsely explaining that the IRS was a creditor because it had not permitted the deduction of certain business expenses. In any event, the 1995 bankruptcy sheds little light on what Neal should have known between 1990 and 1993 about Alimam's trustworthiness in paying taxes.

testified that she has spent all of her income over time (including supporting her adult children), "just breaks even," and has a poor credit rating. Although an incomplete picture of Neal's "basic living expenses" cuts against relief, economic hardship is only one factor in a non-exhaustive list, and no single factor is determinative of whether equitable relief is appropriate. Rev. Proc. 2000-15, § 4.03. Thus, taking into account all of the facts and circumstances and the factors listed in Revenue Procedure 2000-15, § 4.03, we cannot say that the Tax Court abused its discretion in finding that the factors, taken as a whole, weighed in favor of granting relief.

IV.

The Tax Court did not err in conducting a trial *de novo* in reviewing the Commissioner's decision whether Neal was entitled to equitable relief under § 6015(f). The Tax Court also did not abuse its discretion in granting Neal equitable relief. The judgment of the Tax Court is therefore

**AFFIRMED.**

TJOFLAT, Circuit Judge, dissenting:

I dissent from the opinion of the court because a careful review of applicable law reveals that neither the plain language nor the legislative history nor the historical practices of the Tax Court in relation to the innocent spousal relief provision, I.R.C. § 6015(f), indicate Congress's intent to supplant the scope and standard of review set forth in the Administrative Procedure Act ("APA"). Without citation to any cases other than Ewing/Porter, the court has succumbed to the charms of circular reasoning and abdicated its reviewing function—that is, the court holds that the Tax Court's reasoning is correct because the Tax Court provided such reasoning regarding its own scope of review. By condoning the Tax Court's use of a de novo scope of review, the court undermines the Commissioner's incentive to decide taxpayer contests fairly and adequately. Thus, I would vacate the Tax Court's judgment and remand with the instruction that the Tax Court limit its review to the scope of the administrative record.

## I.

## A.

I begin by stating the obvious: the IRS is an "agency" as defined by the APA, the IRS has made findings of fact in this case, and such findings constitute "agency action." 5 U.S.C. § 701 (2008) (defining "agency" as an "authority of the Government of the United States"); id. § 706 (providing scope of review of agency

34

actions).  As the court recognizes, it is a fundamental tenet of administrative law that a court is "ordinarily limited to consideration of the decision of the agency . . . and of the evidence on which it was based."  United States v. Carlo Bianchi, 373 U.S. 709, 714–15, 83 S. Ct. 1409, 1413, 10 L. Ed. 2d 652 (1963).  Pursuant to the APA, in the absence of an exception, a reviewing court must set aside only those agency adjudications that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416, 91 S. Ct. 814, 823, 28 L. Ed. 2d 136 (1971), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99, 105, 97 S. Ct. 980, 984, 51 L. Ed. 2d 192 (1977).  The court's review must be "searching and careful," but "narrow," because "the court is not empowered to substitute its judgment for that of the agency."  Overton Park, 401 U.S. at 416, 91 S. Ct. at 823.

Further, the scope of this review must extend to, and be limited by, the "whole record" compiled by the agency, id. at 419, 91 S. Ct. at 825, "not some new record made initially in the reviewing court."  Camp v. Pitts, 411 U.S. 138, 142, 93 S. Ct. 1241, 1244, 36 L. Ed. 2d 106 (1973).  The reviewing court may obtain additional explanation of the agency decision through affidavits or testimony of the agency officials, but it may not substitute its own facts for those of the agency.  Camp, 411 U.S. at 143, 93 S. Ct. at 1244.

35

Under the APA, in limited circumstances, a reviewing court may conduct a de novo hearing and consider whether an agency's decisions are "unwarranted by the facts to the extent that the facts are subject to trial de novo." 5 U.S.C. § 706(2)(F). In 1973, the Supreme Court confined this exception and allowed de novo review of adjudicative decisions in only those situations where the agency used "inadequate . . . factfinding procedures." Overton Park, 401 U.S. at 416, 91 S. Ct. at 823.

Informal agency adjudication—that is, a decision made without a hearing, findings of facts, and other requirements specified in the APA—does not constitute inadequate factfinding sufficient to justify de novo review. See Camp, 411 U.S. at 141–42, 93 S. Ct. at 1243–44 (holding factfinding procedures adequate where agency adjudication was based on review of the administrative record without conducting a formal oral hearing or issuing findings of fact); Pacific Architect & Eng'rs Inc. v. U.S. Dep't of State, 906 F.2d 1345, 1348 (9th Cir. 1990) (holding factfinding procedures adequate where agency provided notice, company stated objections, and agency rejected objections in a statement of decision); Acumenics Research & Tech. v. U.S. Dep't of Justice, 843 F.2d 800, 804–05 (4th Cir. 1988) (same). But cf. Porter v. Califano, 592 F.2d 770, 782-84 (5th Cir. 1979) (holding agency factfinding procedures were inadequate where the officials accused of corruption by the plaintiff played a "pervasive role" in the factfinding). The

36

informal factfinding procedures undertaken here were adequate and not subject to this <u>de novo</u> exception because Neal had the opportunity to provide information to the examining agent, discuss her claim with that agent, and respond to the agent's determination.

B.

In this case, the Tax Court combined a standard and scope of review not contemplated by the APA:  an abuse of discretion standard and a <u>de novo</u> scope. Because the innocent spousal relief provision, I.R.C. § 6015, was enacted after the APA, the judicial review provisions of APA § 706 may be modified or superseded only if section 6015 does so "expressly."  5 U.S.C. § 559.  The Supreme Court has explained that exemptions from the APA are not to be lightly presumed and must be clear.  <u>Dickinson v. Zurko</u>, 527 U.S. 150, 155, 119 S. Ct. 1816, 1819, 144 L. Ed. 2d 143 (1999); <u>Marcello v. Bonds</u>, 349 U.S. 302, 310, 75 S. Ct. 757, 762, 99 L. Ed. 1107 (1955).  There are no "magical passwords" that signify an exemption, and even the presence of terms like "clearly erroneous" and "substantial evidence" do not conclusively indicate departure from the abuse of discretion standard. <u>Dickinson</u>, 527 U.S. at 156, 119 S. Ct. at 1819 (explaining that the "relevant linguistic conventions were less firmly established before the APA's adoption than they are today"); <u>Marcello</u>, 349 U.S. at 310, 75 S. Ct. at 762.

We consider the express terms of the statute and then the legislative history in prescribing the appropriate standard and scope of review. See Marcello, 349 U.S. at 310, 75 S. Ct. at 762 (holding that the "laborious adaptation" of the APA procedures to deportation proceedings and related legislative history supported exemption from APA); Carlo Bianchi, 373 U.S. at 714, 83 S. Ct. at 1413 (concluding, based on a review of the statute and its legislative history, that review of Wunderlich Act decisions must be made on the administrative record). Neither the plain language of section 6015(e) or (f) nor its legislative history explicitly address the standard or scope of review.

The court, relying on the Ewing/Porter majority, argues that, in the Internal Revenue Code, the scope of review is identified on the face of the statute by the operative term "determine," ante at 26. Ewing v. Comm'r, 122 T.C. 32, 37 (2004), rev'd on other grounds, 439 F.3d 1009, 1014 (9th Cir. 2006); Porter v. Comm'r, 130 T.C. No. 10, 2008 WL 2065189, at *2–3 (Tax Ct. May 15, 2008). I do not dispute the fact that the Tax Court has on numerous occasions conducted de novo hearings to "determine" certain issues. However, I am unconvinced by this argument.

First, we must remain cognizant of the fundamental canon of statutory construction that, "unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." Perrin v. United States, 444

38

U.S. 37, 42, 100 S. Ct. 311, 314, 62 L. Ed. 2d 199 (1979). The Supreme Court has consistently rejected "narrow common-law definition[s]" of statutory terms in favor of "generic definition[s]." See id. at 49, 100 S. Ct. at 317 (rejecting early common law definition of "bribery" and using the "accepted contemporary meaning" in its interpretation of the Travel Act); Taylor v. United States, 495 U.S. 575, 593, 110 S. Ct. 2143, 2155, 109 L. Ed. 2d 607 (1990) (favoring generic meaning of "burglary"); see also Anderson v. Cagle's, Inc., 488 F.3d 945, 955 (11th Cir. 2007) (using broad dictionary definition of "clothes" to interpret Fair Labor Standards Act provision); Walton v. Jamko, Inc., 240 F.3d 1312, 1315 (11th Cir. 2001) (using dictionary definition of "disbursements" to interpret bankruptcy provision). The dictionary definition of "determination" is "the settling and ending of a controversy esp. by judicial decision" or "the resolving of a question by argument of reasoning" or, in the legal context, "a final decision by a court or administrative agency." Webster's Third New International Dictionary 616 (1993); Black's Law Dictionary 460 (7th ed. 1999). These definitions make no mention of scope or standard of review.

Second, even in the Internal Revenue Code, "determination" and "determine" do not exclusively reference de novo review. Congress has defined "determination" in sections relating to personal holding company taxes, deficiency dividends, and mitigation of errors in tax returns as a "decision by the Tax Court . .

39

. which has become final" without reference to the use of a certain scope of review. I.R.C. §§ 547, 860, 1311. Further, though Congress explicitly limited the Tax Court's review to the administrative record when declaring retirement benefits, the legislative history of that section is nonetheless replete with the word "determination." See Tamko Asphalt Prods., Inc. v. Comm'r, 71 T.C. 824, 837 (1979), aff'd, 658 F.2d 735 (10th Cir. 1981) (holding that the Tax Court is limited to the administrative record when declaring retirement benefits); H.R. Rep. No. 94-658, at 244 (1975), reprinted in 1976 U.S.C.C.A.N. 2897, 3139 ("The court is to base its determination upon the reasons provided by the Internal Revenue Service in its notice to the party making the request for a determination . . . .").

The court, citing the Ewing majority, ignores these provisions, stating instead that the Tax Court's long tradition of conducting de novo trials with the term "determine" in section 6015(e)(1)(A) "suggest[s]" the use of a de novo trial here, ante at 18. Ewing, 122 T.C. at 39. A mere suggestion is not sufficient to override the requirements of the APA. See Marcello, 349 U.S. at 310, 75 S. Ct. at 762 (stating that exemptions from the APA are not to be "presumed lightly"). Congress could have provided the standard and scope of review either in the express terms of section 6015(f) or in the legislative history, but it did not do so. Cf. H.R. Rep. No. 105-599, at 266 (1998) (Conf. Rep.) (specifying use of de novo review when validity of tax liability is at issue in deciding levies); I.R.C. § 6404(h)

40

(providing the Tax Court with jurisdiction to "determine whether the Secretary's failure to abate interest . . . was an abuse of discretion").  Thus, pursuant to the APA, the Tax Court must revert to the default: an abuse of discretion standard of review limited to the scope of the administrative record.  See Ninilchik Traditional Council v. United States, 227 F.3d 1186, 1193 (9th Cir. 2000) (rejecting de novo review where such review was not clearly dictated in statute because "§ 706 of the APA functions as a default judicial review standard"); cf. Moon v. American Home Assurance Co., 888 F.2d 86, 89 (11th Cir. 1989) (finding, in ERISA action, that limiting de novo review to the record available to the plan administrator is contrary to the concept of de novo review).

## II.

The court posits that we should look beyond the text and legislative history of section 6015 and apply the standard and scope of review historically used by the Tax Court, ante at 23-26.  The court's argument in support of this proposition is obscure at best and unsupported at worst.  It appears that the court is contending that: (1) prior to the enactment of the APA, statutory and case law required the Tax Court to review decisions of the Commissioner with an abuse of discretion standard and de novo scope of review; (2) this "additional requirement" of procedure continued via the application of APA § 559; and (3) this combination of

41

standard and scope of review applies to the Tax Court's review of all Commissioner's decisions, including those under section 6015(f).

It is true that the enactment of the APA did not "limit or repeal additional requirements" of administrative procedure authorized by statute or by common law, but the prior existence of these additional requirements must be "clear."  5 U.S.C. § 559; Dickinson, 527 U.S. at 155, 119 S. Ct. at 1819.  I begin by summarizing the relevant history of the Tax Court and then explain that, because section 6015 was enacted after the APA, the "additional requirements" exception from the APA does not apply.

## A.

Tax law was simple in 1913, the year the Constitution was amended to authorize Congress to "lay and collect taxes on income":  the Internal Revenue Code was contained in a mere sixteen pages and authorized a flat one-percent income tax on all corporations and a graduated tax from 1% to 7% on all persons with a net income above $3,000.  U.S. Const. Amend. XVI; Pub. L. 63-16, § II, 38 Stat. 166, 168 (1913).  If a taxpayer sought to challenge the government's imposition of taxes, the taxpayer's only recourse was to pay the disputed amount

and then file a refund suit in the Court of Claims or in a federal district court.[22]

Harold Dubroff, The United States Tax Court: An Historical Analysis 28 (1979).

Over the next decade, the tax code became a creature of complexity—the Form 1040 and joint returns were introduced, tax rates were raised, and new types of taxes, like the excise tax and excess profits taxes, were added. Recognizing that increasing complication of the tax code correlated with a rise in tax disputes, in 1924, Congress established the Board of Tax Appeals to allow taxpayers to challenge deficiency determinations prior to paying the contested amount. Pub. L. No. 68-176, § 900, 43 Stat. 253, 336–338 (1924); S. Rep. No. 68-398, at 8 (1924) ("The right of appeal after payment of the tax is an incomplete remedy, and does little to remove the hardship occasioned by an incorrect assessment.").

The Board was an independent agency in the executive branch of government and limited to hearing appeals of "deficiency determinations." Id. Congress defined a deficiency as occurring when the amount imposed by the Internal Revenue Code exceeded the amount shown on the individual or corporation's tax return. Pub. L. No. 68-176, § 273, 43 Stat. 253, 297 (1924). Though not a judicial body, the Board, on appeals of such determinations, was

---

[22] A taxpayer could also seek relief from the Committee on Appeals and Review. But, the Committee was part of the Bureau of Internal Revenue, and the proceedings in the Committee were not public or adversarial and did not permit the introduction of new evidence. Dubroff, supra, at 39.

authorized to hear cases, administer oaths, and examine and subpoena witnesses. Id. At the same time, Congress intended that an appeal before the Board would be a "flexible and informal procedure" so that cases would be determined expeditiously. S. Rep. No. 68-398, at 9 (1924).

In appeals to the Board, the Commissioner's deficiency determinations were deemed presumptively correct, and the taxpayers had the burden of proving that the rulings were erroneous or arbitrary. Helvering v. Taylor, 293 U.S. 507, 515, 44 S. Ct. 287, 291, 79 L. Ed. 623 (1935); Welch v. Helvering, 290 U.S. 111, 115, 54 S. Ct. 8, 9, 78 L. Ed. 212 (1933). If the Board's decision was appealed to a trial court, the findings of the Board were to be considered prima facie evidence in favor of the Board's conclusion. Pub. L. No. 68-176, § 273, 43 Stat. 253, 297 (1924).

Congress expanded the Board's jurisdiction in 1926 to determine overpayment of taxes and again in 1942 to determine refunds of processing taxes. Revenue Act of 1926, Pub. L. No. 69-20, § 284(a), 44 Stat. 9 (1926); Revenue Act of 1942, Pub. L. No. 77-753, § 510, 56 Stat. 798, 967 (1942). Congress changed the name of the Board of Tax Appeals to the "Tax Court of the United States" in 1942, but it retained the Board's status as an executive agency. Revenue Act of 1942, Pub. L. No. 77-753, § 504, 56 Stat. 798, 957 (1942).

Four years later, Congress enacted the APA to govern procedure relating to administrative agencies. Administrative Procedure Act, Pub. L. No. 79-324, § 1, 60 Stat. 237 (1946) (currently codified at 5 U.S.C. § 551). It was, as the Supreme Court has noted, a "legislative enactment which settled 'long-continued and hard-fought contentions, and enacts a formula upon which opposing social and political forces have come to rest.'" Vermont Yankee Nuclear Power Corp. v. Nat'l Resources Defense Council, Inc., 435 U.S. 519, 523, 98 S. Ct. 1197, 1201, 55 L. Ed. 2d 460 (1978). In the legislative history, Congress specifically exempted the "tax functions of the Internal Revenue Service" from formal adjudications that require notice, a hearing, and creation of a record because they are "matter[s] subject to a subsequent trial of the law and the facts de novo in any court." S. Rep. No. 79-752, at 221 (1945), reprinted in Administrative Procedure Act Legislative History, (1994-1946) at 22l (1947); Administrative Procedure Act, 5 U.S.C. § 1005(1) (1946) (currently codified at 5 U.S.C. § 554(a)(1) (2008)). This exemption from  formal adjudication was deemed appropriate because the agency's judgment would be effective "only in a prima facie sense at most," as the aggrieved party would be entitled to judicial retrial in the Tax Court. S. Rep. No. 79-752, at 202, reprinted in Administrative Procedure Act Legislative History at 202.

Relatedly, a reviewing court could go beyond arbitrary and capricious review, and reverse an agency decision if it was "unwarranted by the facts so far as

45

the [facts] are subject to trial de novo." APA § 10 (currently codified at 5 U.S.C. § 706(2)(F)); see also part I.A., supra, (discussing current interpretation of de novo review). In the 1946 APA legislative history, Congress explained that facts would be subject to trial de novo if formal adjudication or rule-making were not required in the organic act or if there had been no administrative hearing that was adequate and exclusive for purposes of factual review. Congress explained that IRS decisions met this latter reason: "[W]here adjudications such as tax assessments are not made upon an administrative hearing and record, contests may involve a trial of the facts in the Tax Court or the United States district courts." S. Rep. No. 79-752, at 214 (1945), reprinted in Administrative Procedure Act Legislative History at 214.

The Fourth Circuit Court of Appeals amplified this legislative history by holding that the Tax Court was generally not subject to the requirements of the APA. O'Dwyer v. Comm'r, 266 F.2d 575, 580 (4th Cir. 1959). The O'Dwyer taxpayer sought to compel the Commissioner to produce the entire administrative record based upon the language in the APA directing the reviewing court to consider the "whole record." Id. at 579. The court concluded that, because the formal adjudication provisions did not apply to IRS proceedings, the Commissioner was not required to compile a record, and, therefore, the Tax Court was not a "reviewing court" that must consider the "whole record." Id. at 580.

46

Though removing the Tax Court from the ambit of the APA, the Fourth Circuit confirmed that, upon appeal to the Tax Court, the Commissioner's assessment was presumed to be correct and the burden was upon the taxpayer to show that the Commissioner's determination was erroneous. Id. at 577.

In 1969, the Tax Court took its present form when Congress established an Article I court of record named the "United States Tax Court" to replace the Tax Court of the United States. Pub. L. 91-172, § 951, 83 Stat. 487, 730 (1969). Congress indicated that it made this change to quell questions regarding the propriety of one agency sitting in judgment of another agency and because the Tax Court only had judicial duties. S. Rep. No. 91-552 (1969), reprinted in 1969 U.S.C.C.A.N. 2027, 2343. The United States Tax Court was a "continuation of the Tax Court of the United States as it existed prior to the date of enactment of the [1969 Revenue Act]" and the change would have "no effect upon . . . jurisdiction." Id. at 2344.

## B.

I do not decide, as the court does, ante at 24, whether this history reveals that Congress clearly imposed an "additional requirement" on the Tax Court to review deficiency determinations, overpayments, and refunds of processing taxes, using an abuse of discretion standard and de novo scope. I do not decide this issue

47

because it is not before this court. See Access Now, Inc. v. Southwest Airlines Co., 385 F.3d 1324, 1330 (11th Cir. 2004) ("[E]valuating an issue on the merits that has not been raised in the initial brief would undermine the very adversarial nature of our appellate system."). However, assuming that such an additional requirement existed and continues via the application of APA § 559, it is impermissible to extend this exception from the APA to the review of innocent spouse relief.

The Supreme Court's holding in Dickinson v. Zurko is instructive. The issue before the Court was whether the Federal Circuit Court of Appeals appropriately reviewed findings of fact made by the Patent and Trademark Office under a clearly erroneous standard, rather than the APA's abuse of discretion standard. Dickinson, 527 U.S. at 152, 119 S. Ct. at 1818. The respondents contended that, prior to the enactment of the APA, patent determinations had been reviewed using the clearly erroneous standard and this additional requirement continued pursuant to APA § 559. In re Zurko, 142 F.3d 1447, 1459 (Fed. Cir. 1998). The Supreme Court stated that the respondents

> must show more than a possibility of a heightened standard [prior to the enactment of the APA], and indeed more than even a bare preponderance of evidence in their favor. Existence of the additional requirement must be clear.

48

Dickinson, 527 U.S. at 154–55, 119 S. Ct. at 1819. Permitting departure from the APA based on an ambiguous historical requirement in previous case law would frustrate the purpose of the APA to bring "uniformity to a field full of variation and diversity." Id. After analyzing 89 pre-APA decisions reviewing findings of fact of the Patent Office, the Court found ambiguity because most of them used a "manifest error" or "clearly wrong" standard rather than a "clearly erroneous" standard. Id. at 156, 119 S. Ct. at 1820. Thus, the Court reversed the Federal Circuit and held that the APA's abuse of discretion standard should be applied.

In Dickinson, unlike the case at hand, no new statute had been introduced that led to the Supreme Court's review; the Federal Circuit sought to review findings of fact of patent and trademark applications in 1998 and the courts had authority to review such findings of fact in 1946. Id. at 154, 119 S. Ct. at 1819; see also United Transp. Union v. Interstate Commerce Comm'n, 52 F.3d 1074, 1080 n.10 (D.C. Cir. 1995) (finding declaratory orders relating to Interstate Commerce Act to be an "additional requirement" where the Commission had been using such orders prior to the APA and the Supreme Court had assumed the practice to be proper). On the other hand, here, the Tax Court was granted jurisdiction over a new type of relief in 1998. As discussed in part I, because the innocent spousal relief provision was enacted subsequent to the APA, an exemption from the requirements of the APA must be shown clearly via the text of the statute and the

49

legislative history. In other words, we should not even reach the point of analysis reached by the <u>Dickinson</u> Court, because the statute at issue was not part of the Internal Revenue Code when the APA was enacted.

The court argues that the steps of review presented in <u>Dickinson</u> are irrelevant because "§ 6015 was enacted 'as part and parcel of' and with similar language to, the statutory framework of deficiency determinations." <u>Ante</u> at 27 n.17. The court gives no guidance to determine whether a statute or part of a statute is "part and parcel of" another. Nor has the court addressed why the innocent spousal relief provision is "part and parcel" of the deficiency framework. Indeed, in this case, the innocent spousal relief provision is being used in a collection case—proving that the innocent spousal relief provision is not necessarily tied to the deficiency procedures. Even if the "part and parcel" criterion could provide a rational or administrable test for discerning exceptions to APA § 559, the most I can concede here is that § 6015 is "part and parcel" of the Internal Revenue Code as a whole. Surely, the court could not have intended to exempt any amendment to the tax code from APA § 559; yet that is the logical conclusion of the court's tortured and unsupported analysis. At worst, the analysis presented by the court seems to authorize use of the APA § 559 exception in all statutes, without regard to whether the provision at issue was enacted before or after the APA.

50

Even if I blind myself to the inapplicability of the "additional requirements" exemption, I find no clear indication that a de novo scope of review should be used in innocent spousal relief determinations. There is no pre-APA indication as to the standard or scope of review to be used in conjunction with decisions not involving deficiency determinations, overpayments, or refunds of processing taxes because such decisions would have been moot or not ripe for adjudication. I also find unpersuasive the Ewing/Porter majority's and Neal's reliance on O'Dwyer, 266 F.2d at 580, because the Fourth Circuit's decision was premised on the now-defunct notion that informal agency action need not be reviewed on the administrative record. See part I.A, supra; Camp, 411 U.S. at 142, 93 S. Ct. at 1244.

Confronted with the same combination of standard and scope of review argued here, our sister circuit held that review of collection due process cases should be limited to the administrative record. Robinette v. Comm'r, 439 F.3d 455, 461 (8th Cir. 2006). The Robinette court explained that, when Congress authorized judicial review of collection determinations to the Tax Court in 1998, the "nature and purpose" of those proceedings were different from deficiency determinations and it was "just as likely" that Congress intended traditional principles of administrative law be used. Id. The Tax Court's own decisions in collection due process cases belie the Ewing/Porter majority's contention that the

51

record rule does not apply to the Tax Court. <u>Giamelli v. Comm'r</u>, 129 T.C. 107, 115 (2007) (holding that collection proceedings reviewed under an abuse of discretion standard must be limited to the issues raised before Appeals); <u>Magana v. Comm'r</u>, 118 T.C. 488, 493 (2002) (same). The court avoids the reasoning of the <u>Robinette</u> court upon the basis that the statutes at issue are different, <u>ante</u> at 28. However, the court fails to recognize that here, as in <u>Robinette</u>, the Commissioner seeks to collect unpaid taxes from Neal, not assess a deficiency. These collection due process cases bolster the case for limiting the scope of review to the administrative record. To argue, as the court does, that a collection due process case under I.R.C. § 6330 should be treated differently than a collection case under I.R.C. § 6015(f) exalts form over substance.

Indeed, that is the same deficiency found in the court's argument that limiting review to the administrative record will result in anomalous decisions involving the same statute. For example, the court posits that, if Taxpayer X seeks equitable relief via section 6015(f) and the IRS fails to issue a final determination within six months, X may directly petition the Tax Court for relief. I.R.C. § 6015(e)(1)(A). In that case, unlike Neal's situation, the Tax Court will be required to conduct <u>de novo</u> review because the IRS will not have compiled an administrative record.

52

I disagree that allowing a <u>de novo</u> scope in X's case but limiting the scope of review to the administrative record in Neal's case is problematic. The court and <u>Porter/Ewing</u> majority focus erroneously on the status of the court reviewing the decision of the administrative body, rather than the status of the administrative body itself.[23] APA § 706 applies to a court's review of an "agency action"; where there is no "agency action," the APA does not apply. 5 U.S.C. § 706. In Neal's case, there has been agency action; in X's case, there has been no agency action. To permit the Tax Court to override the agency's findings of fact undermines the very purpose of the APA:

> This sound and clearly expressed purpose [of expediting review of agency decisions] would be frustrated if either side were free to withhold evidence at the administrative level and then to introduce it in a judicial proceeding. Moreover, the consequence of such a procedure would in many instances be a needless duplication of evidentiary hearings and a heavy additional burden in the time and expense required to bring litigation to an end.

---

[23] This same defect infects <u>Nappi v. Comm'r</u>, 58 T.C. 282, 284 (1972), in which the Tax Court held that the APA categorically did not apply to the Tax Court because it was an Article I court. The <u>Nappi</u> court conflated the APA provisions for an agency, which were not applicable to the Tax Court after 1969, with the APA requirements for a court reviewing an agency action. <u>See</u> 35 Fed. Reg. 12462 (Aug. 5, 1970) (deleting the Tax Court's public notices, orders, and rules from the Federal Register because the court was "no longer within the purview of the APA"). The appropriate focus should not have been the status of the Tax Court but whether the administrative body seeking review was an agency subject to standards that a reviewing court must use. <u>See</u> 5 U.S.C. § 706.

Carlo Bianchi, 373 U.S. at 717, 83 S.Ct. at 1415.  While both Taxpayer X's request

for relief and Neal's are premised on section 6015(f), they arise under wholly

different procedural circumstances and, accordingly, are reviewed differently.[24]

I do not deny the possibility that Congress may have intended that the Tax

Court continue reviewing all matters in which it is granted jurisdiction using an

abuse of discretion standard and de novo scope of review.  But, a mere possibility

is not sufficient to overwhelm Congressional interest in preserving uniformity and

fairness in administrative procedure.

## III.

All of this leads to a singular conclusion: allowing the Tax Court carte-

blanche authority to override the Commissioner using the vehicle of a de novo trial

reveals distrust in the Commissioner's decisions and decimates the

Commissioner's incentive to be impartial and thorough in those determinations.

Congress, in enacting the judicial review provisions of the Administrative

Procedure Act, protected this incentive by giving deference to agencies:

> In the first instance . . . it will be the function of the agency to
> determine the sufficiency of the evidence upon which it acts–and the

---

[24] I am equally unpersuaded by the citation to § 6015(e)(4), under which the non-requesting spouse may intervene in the Tax Court hearing.  There is nothing to suggest that, by allowing intervenors, Congress intended that trials be conducted de novo or that third parties may introduce matters outside the scope of the administrative record.  Cf. Vermont Yankee, 435 U.S. at 554-55, 98 S. Ct. at 1217 (upholding Atomic Energy Commission's refusal to consider conservation alternatives introduced by intervenor after the initial decision).

proper performance of its public duties will require it to undertake this inquiry in a careful and dispassionate manner . . . . Judicial review is of utmost importance, but it can be operative in relatively few cases because of the cost and general hazards of litigation. . . . For that reason the agencies must make the first, primary, and most far-reaching effort to comply with the terms and the spirit of this bill.

S. Rep. No. 79-752, at 216–17 (1945), reprinted in Administrative Procedure Act Legislative History at 217; see also Overton Park, 401 U.S. at 416, 91 S. Ct. at 823 ("The court is not empowered to substitute its judgment for that of the agency.").

Today, the court has given the Tax Court the authority to second-guess the Commissioner at its whim, superimposed upon the farce that the Commissioner's determination is given discretionary weight. Under such a scheme, why should the Commissioner conduct his hearings in a careful and diligent manner? Why bother when the Commissioner knows that his review of the facts and law will be ignored? For that matter, why should taxpayers be required to fund and use the IRS appeals process since any conclusions made by those federal officials will dissipate in the Tax Court like whispers in the wind? I have found no satisfactory answers to these questions. Therefore, I respectfully dissent from the court's judgment.